UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
CAROLINE MEMNON,                          :
                                          :
                         Plaintiff,       :
                                          :
            v.                            :    No. 08-CV-2874 (HB)
                                          :
CLIFFORD CHANCE LLP and                   :
SULLIVAN AND WORCESTER LLP,               :
                                          :
                         Defendants.      :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## DEFENDANT SULLIVAN & WORCESTER LLP'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL RECONSIDERATION


Dated: New York, New York
       November 9, 2009

*Of Counsel:*

       Dov Kesselman (DK-6571)
       Anjanette Cabrera (AC-3922)


SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500

Attorneys for Defendant Sullivan & Worcester LLP

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT ............................................................................................................................... 3

I.      Applicable Standard on Motion for Reconsideration of Order Denying Summary
        Judgment ........................................................................................................................ 3

II.     The Court Should Reconsider Its Order Denying S&W Summary Judgment on
        Plaintiff's Claim for Discriminatory Termination ............................................................. 4

        A.      The Court Mistakenly Relied Upon Statistical Evidence To Find That Plaintiff
                Established Circumstances Giving Rise to an Inference of Discrimination ........... 4

        B.      Even if the Court Believed that the "Evidence" Relied Upon By Plaintiff Met
                the "Minimum" *Prima Facie* Burden, It Is Insufficient to Establish the Heavier
                Pretext Burden Because It Does Not Demonstrate That S&W Intentionally
                Terminated Plaintiff For Discriminatory Reasons. .................................................. 9

        C.      The Arguments Relied Upon By The Court In The Context Of Plaintiff's
                Performance Is Not Evidence, Cannot Support A Finding Of Pretext, And
                Improperly Shifts The Burden To S&W ................................................................ 13

        D.      Summary Judgment Should Have Been Granted Based  As Well Upon The
                Same-Actor Defense. ........................................................................................... 15

CONCLUSION .......................................................................................................................... 19

NY1 26595755.5

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Allen v. J.P. Morgan Chase & Co.,
No. 06 Civ. 8712 (JGK), 2009 WL 857555 (S.D.N.Y. Mar. 31, 2009) ..................................17

Banco del Seguros del Estado v. Mut. Marine Offices, Inc.,
230 F. Supp. 2d 427 (S.D.N.Y. 2002)......................................................................................3

Bookman v. Merrill Lynch,
No. 02 Civ. 1108 (RJS), 2009 WL 1360673 (S.D.N.Y. May 14, 2009)....................................7

Braunstein v. Barber,
No. 7:06-Civ.-5978 (CS), 2009 WL 849589 (S.D.N.Y. Mar. 30, 2009) ..................................17

Bryant v. Verizon Commc'n, Inc.,
550 F. Supp. 2d 513 (S.D.N.Y. 2008).....................................................................................12

Bussey v. Phillips,
419 F. Supp. 2d 569 (S.D.N.Y. 2006)..................................................................................6, 13

Caidor v. Potter,
No. 5:02-Civ-1486 (NAM), 2007 WL 2847229 (N.D.N.Y. Sept. 26, 2007)...........................7

Copeland v. Rosen,
38 F. Supp. 2d 298 (S.D.N.Y. 1999).......................................................................................18

Cordell v. Verizon Commc'n, Inc.,
331 Fed. Appx. 56 (2d Cir. 2009) ............................................................................................8

Crawford v. Dep't of Investigation,
324 Fed. Appx. 139 (2d Cir. 2009).......................................................................................9, 12

DeLuca v. Bank of Tokyo-Mitsubishi UFJ, Ltd.,
No. 06 Civ. 5474 (JGK), 2008 WL 857492 (S.D.N.Y. Mar. 31, 2008) ..............................6, 16

Dorcely v. Wyandanch Union Free Sch. Dist.,
No. 06-Civ-1265 (DRH), 2009 WL 3232866 (E.D.N.Y. Sept. 30, 2009) ..........................16, 18

Dorfman v. DOAR Commc'ns, Inc.,
No. 03 Civ. 573 (SLT), 2005 WL 1861813 (E.D.N.Y. Aug. 2, 2005) ....................................6

Drake v. Delta Air Lines,
No. 94-CV-5944 (FB), 2005 WL 1743816 (E.D.N.Y. July 21, 2005) ....................................13

Fleming v. MaxMara USA, Inc.,
No. 06-CV-6357 (CPS), 2009 WL 1910946 (E.D.N.Y. June 30, 2009) ..................................7

Galimore v. City Univ. of N.Y.,
641 F. Supp. 2d 269 (S.D.N.Y. 2009)....................................................................................12

Gambello v. Time Warner Commc'ns, Inc.,
186 F. Supp. 2d 209 (E.D.N.Y. 2002) ................................................................................6, 8

Global Network Commc'n Inc. v. City of N.Y.,
458 F.3d 150 (2d Cir. 2006)....................................................................................................14

Grady v. Affiliated Cent., Inc.,
130 F.3d 553 (2d Cir. 1997)....................................................................................................18

Griffin v. TNT Int'l Express,
No. 05 Civ. 10475 (PKC), 2008 WL 697680 (S.D.N.Y. Mar. 12, 2008) ...............................11

Guider v. F.W. Woolworth Corp.,
No. 96 Civ. 3168 (LAP), 1998 WL 702275 (S.D.N.Y. Oct. 7, 1998) .........................5, 6, 8, 12

Hammer v. FedEx,
No. 07 Civ. 1445 (BMC), 2008 WL 2220029 (E.D.N.Y. May 28, 2008) ...............................10

Hill v. U.S.P.S.,
522 F. Supp. 1283 (S.D.N.Y. 1981).....................................................................................6, 8

James v. New York Racing Ass'n,
233 F.3d 149 (2d Cir. 2000).....................................................................................................10

Jenkins v. Metropolitan Opera Ass'n, Inc.,
No. 96 Civ. 6665 (JFK), 1999 WL 147745 (S.D.N.Y Mar. 18, 1999) .....................................7

Jones v. Yonkers Public Sch.,
326 F. Supp. 2d 536 (S.D.N.Y. 2004).....................................................................................17

Kolesnikow v. Hudson Valley Hosp. Ctr.,
622 F. Supp. 2d 98 (S.D.N.Y. 2009).......................................................................................18

Kremer v. New York State Ins. Dep't,
No. 06 Civ. 9949 (RLC), 2009 WL 2776637 (S.D.N.Y. Sept. 1, 2009)...................................3

LaMarch v. Tishman Speyer Prop., L.P.,
No. 03 CV 5246 (CBA), 2006 WL 2265086 (E.D.N.Y. Aug. 8, 2006) .................................5, 7

Lee v. Poughkeepsie City Sch. Dist.,
No. 06-CV-4660 (KMK), 2008 WL 852790 (S.D.N.Y. Mar. 31, 2008) ...................................13

NY1 26595755.5

Martin v. Citibank, N.A.,
    762 F.2d 212 (2d Cir. 1985)................................................................................5

Memnon v. Wine Project, Inc.,
    Index No. 044300 (N.Y. Civ. Ct. 2009)..............................................................14

Miles v. City of N.Y.,
    No. CV-99-7365 (JG), 2002 WL 31410346 (E.D.N.Y. Oct. 24, 2002)....................7

Muhleisen v. Wear Me Apparel LLC,
    No. 07 Civ. 8748 (NRB), 2009 WL 2355784 (S.D.N.Y. July 30, 2009)................16

Noble v. Career Educ. Corp.,
    No. 07-CV-5832 (KMK), 2009 WL 2391864 (S.D.N.Y. Aug. 4, 2009)...........7, 18

Pacheco v. N.Y. Presbyterian Hosp.,
    593 F. Supp. 2d 599 (S.D.N.Y. 2009)................................................................6, 8

Pasha v. William M. Mercer Consulting, Inc.,
    No. 00 Civ. 8362 (RWS), 2004 WL 188077 (S.D.N.Y. Feb. 2, 2004)................6, 8

Schnabel v. Abramson,
    232 F.3d 83 (2d Cir. 2000)................................................................................18

Skelton v. Sara Lee Corp.,
    249 Fed. Appx. 450 (6th Cir. 2007)..................................................................15

Smith v. Tuckahoe Union Free Sch. Dist.,
    No. 03 Civ. 7951 (PGG), 2009 WL 3170302 (S.D.N.Y. Sept. 30, 2009) .............17

Ste. Marie v. Eastern R. Ass'n,
    650 F.2d 395 (2d Cir. 1981)..............................................................................15

Stoddard v. Eastman Kodak Co.,
    309 Fed. Appx. 475 (2d Cir. 2009)....................................................................13

Torres v. Do It Best Corp.,
    No. 07-CV-230 (CS), 2008 WL 4974588 (S.D.N.Y. Nov. 24, 2008) ....................12

Townsend v. Benjamin Enter.,
    No. 05 Civ. 9378 (GAY), 2008 WL 1766944 (S.D.N.Y. Apr. 17, 2008)................4

Uribe v. Kellogg's Snacks/Keebler, Inc.,
    No. 05 Civ. 02959 (PKG), 2009 WL 1098369 (S.D.N.Y. Apr. 22, 2009) .............11

Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.,
    956 F.2d 1245 (2d Cir. 1992)..............................................................................3

iv

Wexler v. White's Fine Furniture, Inc.,
    317 F.3d 564 (6th Cir. 2003) ....................................................................................15

Whaley v. City Univ. of New York,
    555 F. Supp. 2d 381 (S.D.N.Y. 2008)....................................................................12

Wilson v. N.Y.P. Holdings, Inc.,
    No. 05 Civ. 10355 (LTS), 2009 WL 873206 (S.D.N.Y. Mar. 31, 2009)................10

Yarde v. Good Samaritan Hosp.,
    360 F. Supp. 2d 552 (S.D.N.Y. 2005)......................................................................8

Zahorik v. Cornell Univ.,
    729 F.2d 85 (2d Cir. 1984)......................................................................................12

Zenni v. Hard Rock Café Int'l,
    903 F. Supp. 644 (S.D.N.Y. 1995)............................................................................7

NY1 26595755.5

## PRELIMINARY STATEMENT

Defendant Sullivan and Worcester LLP ("S&W") respectfully submits this Memorandum of Law in Support of its Motion for Reconsideration of that portion of the Court's Opinion and Order dated October 27, 2009, Docket No. 94 (the "Order", attached hereto as Exhibit A), that denied in part S&W's motion for summary judgment on Plaintiff Caroline Memnon's ("Plaintiff") claim for discriminatory termination.[1]  S&W respectfully submits that the Court's denial of summary judgment on Plaintiff's discrimination claim was premised on several erroneous factual conclusions, together with an attempted reliance by Plaintiff on the kind of "statistical" information without any expert statistical analysis nor any contextual evidence that the courts have repeatedly held cannot support even the "minimal" burden necessary to support an inference of discrimination, much less the heavier burden required to support a finding of intentional discrimination at the pretext stage.  As such, S&W requests that that the Court reconsider its Order and dismiss Plaintiff's  remaining claim against S&W in its entirety.

As the Court is aware, Plaintiff is an African-American female attorney who was hired on February 5, 2007 by S&W based on her stated experience, but was terminated six weeks later based upon her poor performance revealing a distinct lack of experience for someone at her level — perhaps unsurprising now in light of Plaintiff's own allegations that she did not receive the training or experience at Clifford Chance that other associates received.  The Court denied summary judgment on Plaintiff's discrimination claims, finding that Plaintiff's "minimum" *prima facie* burden of establishing circumstances creating an "inference of discrimination" had been met based on:  (1) quasi-statistical inferences of discrimination based on Plaintiff's

---

[1] The Court's Order granted S&W's motion with respect to Plaintiff's retaliation claims, as well as portions of Defendant Clifford Chance LLP's motion for summary judgment.  S&W does not address the dismissed claims.

evidence that in 2007 and 2008, S&W hired six associates in its corporate department, of which "only two" were African American, that the next senior associate hired was white — though the next associate was in fact a black woman — and that both black associates happened to have experienced performance problems, despite the absence of any expert evidence offered by Plaintiff to support this "statistical" inference and the well-established case law holding that such simple statistics are insufficient to permit a plaintiff to establish an inference of discrimination; (2) a question of fact existed as to whether the "same actors" who hired Plaintiff decided to terminate her employment, based upon the erroneous conclusion that two individuals, Goss and Barnard, were involved in the termination decision but not in the hiring decision (Order at 19), when in fact the evidence shows that Goss was involved in Plaintiff's hiring, and Barnard did not make the termination decision; and (3) the "same-actor inference is permissive, not mandatory" and electing not to consider it even though this "permissive" treatment has been limited to where the same-actors later made discriminatory comments, a long period of time passed between the decisions such that discriminatory mindsets may have changed, or there existed other significant evidence of intentional discrimination not present here.

Moreover, at the pretext stage, where Plaintiff no longer has the benefit of an inference of discrimination and her once "minimum" burden becomes far more onerous, this kind of "evidence" is even more inappropriate, as well-settled law holds that even if the simple statistics such as the composition of S&W's workforce or performance issues were supported by appropriate evidence, they are insufficient to establish pretext because they do not provide the necessary individualized proof to demonstrate that Plaintiff, herself, was a victim of discrimination. Furthermore, Plaintiff's arguments of pretext based upon assumptions of Plaintiff's competence drawn from suppositions about, for example, why a client would have left

S&W to join Plaintiff — though newly discovered information shows that she offered the client a bargain-basement price of $2,000 to obtain a license, and she is now being sued by this very client for legal malpractice and churning — not only fail to meet minimal standards of evidence, but as importantly, do not evidence the required next step: not only that the stated legitimate and non-discriminatory reason was pretextual, but that there is sufficient admissible evidence upon which a jury could reasonably conclude that it was intentional discrimination based on her race, national origin, or gender that was the basis for Plaintiff's termination. This, Plaintiff has not done — indeed, Plaintiff's own deposition testimony establishes her belief that it was things other than her race that was at play.

As set out in more detail below, S&W respectfully requests that the Court reconsider its Order and grant S&W summary judgment in its entirety.

## ARGUMENT

### I. APPLICABLE STANDARD ON MOTION FOR RECONSIDERATION OF ORDER DENYING SUMMARY JUDGMENT

A Court should grant a motion for reconsideration pursuant to Rule 59(e) of the Federal Rules of Civil Procedure and Southern District Local Civil Rule 6.3 if the moving party demonstrates that the Court overlooked "controlling decisions or factual matters that were put before it on the underlying motion, and which, had they been considered, might have reasonably altered the result before the court." Banco del Seguros del Estado v. Mut. Marine Offices, Inc., 230 F. Supp. 2d 427, 428 (S.D.N.Y. 2002); Kremer v. New York State Ins. Dep't, No. 06 Civ. 9949 (RLC), 2009 WL 2776637, at *1 (S.D.N.Y. Sept. 1, 2009).[2] Thus, a Court will grant a motion for reconsideration where, as here, it is necessary to correct clear error or prevent

---

[2] For the convenience of the Court, copies of decisions reported only on Westlaw are annexed to the accompanying "Compendium of Unreported Cases in Support of Defendant Sullivan & Worcester, LLP's Memorandum of Law in Support of Its Motion for Partial Reconsideration."

manifest injustice.  See Kremer, 2009 WL 2776637, at *1 (citing Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992)); Townsend v. Benjamin Enter., No. 05 Civ. 9378 (GAY), 2008 WL 1766944, at *1 (S.D.N.Y. Apr. 17, 2008).

II.  **THE COURT SHOULD RECONSIDER ITS ORDER DENYING S&W SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR DISCRIMINATORY TERMINATION**

S&W respectfully submits that the Order misapplied the legal principles governing resolution of Plaintiff's claim of discriminatory termination.  First, with respect to Plaintiff's *prima facie* burden to establish that her termination occurred under circumstances giving rise to an "inference of discrimination," the Court relied on generalized statistics that are, as a matter of law, incapable of giving rise to an inference of discrimination.  Second, with respect to Plaintiff's burden to establish pretext in that she was terminated for discriminatory reasons, the Court's determination that this burden was met rested upon the inference that arose at the *prima facie* stage, rather than on any appropriate evidence establishing that S&W, in fact, intentionally discriminated against Plaintiff in terminating her employment.

A.  **The Court Mistakenly Relied Upon Statistical Evidence To Find That Plaintiff Established Circumstances Giving Rise to an Inference of Discrimination**[3]

The Court found that Plaintiff established that her termination occurred under circumstances giving rise to an "inference of discrimination," an element of her *prima facie* burden, because "the very next senior associate to be hired in S&W's corporate department in New York was white, and that in 2007 and 2008, S&W hired six associates in the corporate department of which only two were black…and both of those black associates were either

---

[3]  S&W notes that the Order addressed the "same-actor" inference before even addressing the evidence proffered by Plaintiff to establish an inference of discrimination.  (Order at 19.)  Of course, even in the absence of a same-actor inference, Plaintiff bears the burden of putting forth evidence that could giving rise to an inference of discrimination, and if the evidence fails to do so, a question of fact as to whether the same actors were involved in the hiring and termination — though no such issue exists — does not provide a basis to infer discrimination.  S&W therefore addresses Plaintiff's evidence first, and then turns to the same-actor issue.

terminated or experienced performance problems." (Order at 19). Because this evidence is insufficient, as a matter of law, to give rise to an inference of discrimination, S&W respectfully submits that the Court should reconsider its finding that Plaintiff met her *prima facie* burden.

As an initial matter, S&W submits that the hiring of "only two" black corporate associates out of six (Order at 19) itself conclusively <u>disproves</u> any discrimination, as such a diversity ratio (33%) would appear to well exceed the available candidate pool. More importantly, finding this kind of anecdotal and non-contextual statistics (that S&W hired "only two" African-American associates) toprovide an "inference of discrimination" is "clear error," as the courts of this Circuit have repeatedly made clear that such evidence has little probative value and cannot support an inference of discrimination. For instance, the number of African-American associates hired compared to white associates is meaningless absent evidence of the availability of African-American candidates for employment in the general market and the number of African-American versus white applicants to S&W, just as the fact that the performance of two African-American associates offers no statistically useful inference, such that "no rational jury could draw any inference regarding [race] discrimination."[4] <u>LaMarch v. Tishman Speyer Prop., L.P.</u>, No. 03 CV 5246 (CBA), 2006 WL 2265086, at *6 (E.D.N.Y. Aug. 8, 2006). Indeed, the case law is legion in holding that statistical evidence, without more, is insufficient for a plaintiff to meet her *prima facie* burden. See <u>Martin v. Citibank, N.A.</u>, 762 F.2d 212, 219 (2d Cir. 1985) (affirming summary judgment and noting that statistical evidence

---

[4]      By way of illustration, if the two African-American associates the Court references were the only two that applied a position with S&W, an inference of discrimination would be entirely improper. This is the type of contextual evidence that is lacking from the record and which prevents Plaintiff from meeting her *prima facie* burden. <u>See Guider v. F.W. Woolworth Corp.</u>, No. 96 Civ. 3168 (LAP), 1998 WL 702275, at *11 (S.D.N.Y. Oct. 7, 1998) (granting summary judgment and stating: "Plaintiff's statistical evidence only accounts for the ages of those individuals hired, while ignoring the ages of those individuals who applied for the position. For example, the ages of the individual . . . applicants could all be under 40. . . . Without accounting for these factors, the statistics do not support an inference of age discrimination.").

alone ordinarily cannot establish a *prima facie* case of disparate treatment under Title VII); Pacheco v. N.Y. Presbyterian Hosp., 593 F. Supp. 2d 599, 616 (S.D.N.Y. 2009) (granting summary judgment and finding statistics concerning employee composition and terminations within department insufficient to give rise to inference of discrimination where there was no evidence as to the reasons why these employees left their employment); DeLuca v. Bank of Tokyo-Mitsubishi UFJ, Ltd., No. 06 Civ. 5474 (JGK), 2008 WL 857492, at *14 (S.D.N.Y. Mar. 31, 2008) (granting summary judgment and stating: "generalized statistics do not provide support for the plaintiff's claim that [the] decision to terminate him was motivated in any way by his age or national origin"); Bussey v. Phillips, 419 F. Supp. 2d 569 (S.D.N.Y. 2006) (granting summary judgment and stating: "[I]n an individual disparate treatment case, unlike in a class action or case alleging widespread disparate treatment, statistics alone do not suffice to establish discriminatory intent."); Dorfman v. DOAR Commc'ns, Inc., No. 03 Civ. 573 (SLT), 2005 WL 1861813, at *4 (E.D.N.Y. Aug. 2, 2005) (same), aff'd, 314 Fed. Appx. 389 (2d Cir. 2009); Pasha v. William M. Mercer Consulting, Inc., No. 00 Civ. 8362 (RWS), 2004 WL 188077, at *6-7 (S.D.N.Y. Feb. 2, 2004) (rejecting plaintiff's attempt to establish *prima facie* case by resort to non-contextual statistics and granting summary judgment), aff'd, 135 Fed. Appx. 489 (2d Cir. 2005); Gambello v. Time Warner Commc'ns, Inc., 186 F. Supp. 2d 209, 224 (E.D.N.Y. 2002) (granting summary judgment and finding that non-contextual statistical information concerning the employer's terminations of other employees was insufficient to give rise to an inference of discrimination); Guider, 1998 WL 702275, at *11; Hill v. U.S.P.S., 522 F. Supp. 1283, 1296-97 (S.D.N.Y. 1981) (granting summary judgment and holding that an analysis that fails to take into account composition of relevant applicant pool is insufficient to establish *prima facie* case of

discrimination).  Accordingly, the statistics referenced by the Court are insufficient as a matter of law to give rise to an inference of discrimination.

Furthermore, Plaintiff's "statistical" arguments are unsupported by any expert evidence that could even remotely lend credibility to them as evidence, and the courts of this Circuit have routinely rejected unsupported statistical "evidence" to suffice as evidence to support a plaintiff's minimal *prima facie* burden.  See Caidor v. Potter, No. 5:02-Civ-1486 (NAM), 2007 WL 2847229, at *8 (N.D.N.Y. Sept. 26, 2007) (granting summary judgment and rejecting plaintiff's attempt to establish inference of discrimination by resort to statistics unsupported by expert testimony); LaMarch, 2006 WL 2265086, at *6 (same); Miles v. City of N.Y., No. CV-99-7365 (JG), 2002 WL 31410346, at *4 (E.D.N.Y. Oct. 24, 2002) (granting summary judgment and stating: "[The statistics are] not supported by any expert analysis and simply does not provide enough information to allow meaningful inferences to be drawn"); Jenkins v. Metropolitan Opera Ass'n, Inc., No. 96 Civ. 6665 (JFK), 1999 WL 147745, at *7 (S.D.N.Y Mar. 18, 1999) (granting summary judgment and finding that statistical evidence, without expert support, suffers from "serious flaws"), aff'd, 213 F.3d 626 (2d Cir. 2000); Zenni v. Hard Rock Café Int'l, 903 F. Supp. 644, 653 (S.D.N.Y. 1995) (same).  In the absence of such expert testimony, the Court should not have attributed any persuasive value to the statistics — even at the *prima facie* stage.

Likewise, the race of the next associate hired by S&W cannot support an inference of discrimination.  First, while the Court held that "next senior associate to be hired in S&W's corporate department in New York was white," (Order at 19), the Court overlooked the undisputed fact that the very next associate hired after Plaintiff was an African-American woman of Haitian ancestry, precluding any suggestion of discrimination. (S&W Stmt. Fact ¶ 65).  See, e.g., Noble v. Career Educ. Corp., No. 07-CV-5832 (KMK), 2009 WL 2391864, at *10

(S.D.N.Y. Aug. 4, 2009); <u>Fleming v. MaxMara USA, Inc.</u>, No. 06-CV-6357 (CPS), 2009 WL 1910946, at *8 (E.D.N.Y. June 30, 2009); <u>Yarde v. Good Samaritan Hosp.</u>, 360 F. Supp. 2d 552, 556 (S.D.N.Y. 2005). Moreover, as noted above, the mere fact that the "next <u>senior</u> associate to be hired . . . was white" without any context fails to suggest discrimination, and Plaintiff offers <u>no</u> evidence as to the candidate pool, the number of African-American applicants, or their comparative criteria. <u>See</u> <u>Pacheco</u>, 593 F. Supp. 2d at 616 (granting summary judgment and finding statistics, without contextual evidence, insufficient to give rise to inference of discrimination); <u>Pasha</u>, 2004 WL 188077, at *6-7 (same); <u>Gambello</u>, 186 F. Supp. 2d at 224 (same); <u>Guider</u>, 1998 WL 702275, at *11 (same); <u>Hill</u>, 522 F. Supp. at 1296-97 (same).

Indeed, it is no surprise that other than forced inferences from unfounded statistics, Plaintiff cannot offer any actual evidence of discrimination. The record is bereft of <u>any</u> discriminatory comments or remarks based upon Plaintiff's race, national origin, and gender and Plaintiff does not point to any <u>evidence</u> that her termination was based on her protected status. To the contrary, Plaintiff was asked "point blank" at her deposition for any facts that prompted her belief that race, national origin, or gender discrimination was at play. Plaintiff made clear that there was no such evidence, and instead testified that her discrimination claim was really just a restatement of her dismissed retaliation claim:

> Q:  Were there ever any comments or behavior towards you that you believe was discriminatory because of national origin?
>
> A:  I don't separate them. My claim is a retaliation claim in which Sullivan & Worcester colluded with Clifford Chance based on a discrimination complaint that I made at Clifford Chance with regards to my national origin, my gender, and my race.
>
>                  *                *                *
>
> Q:  What facts do you have to establish that you were discriminated against because of your race by Sullivan & Worcester?

8

A:      My claim against Sullivan & Worcester is a retaliation claim based on discrimination and the facts underlying such claim is basically their collusion with Clifford Chance based on my discrimination complaint or my discrimination - - my discriminatory treatment at Clifford Chance.

(Pl. Tr. 206:14-22, 208:4-12).[5]

At bottom, S&W respectfully submits that the caselaw precludes a finding of discrimination even at the *prima facie* stage, and the Court should reconsider its Order and enter summary judgment in S&W's favor.

> **B.      Even if the Court Believed that the "Evidence" Relied Upon By Plaintiff Met the "Minimum" *Prima Facie* Burden, It Is Insufficient to Establish the Heavier Pretext Burden Because It Does Not Demonstrate That S&W Intentionally Terminated Plaintiff For Discriminatory Reasons.**

The Court noted in the Order that Plaintiff's *prima facie* burden is "minimal," (Order at 19), and as such concluded that that burden was met. As noted above, the caselaw strongly counsels against such a finding. However, even assuming that the Court permitted Plaintiff to squeak by at that stage, Plaintiff's burden at the pretext stage is different, and in fact greater, than her *prima facie* burden in that Plaintiff must establish by a preponderance of the evidence and without the benefit of any "intermediate burdens or presumptions" that intentional discrimination motivated her termination.  See, e.g., Crawford v. Dep't of Investigation, 324 Fed. Appx. 139, 141-42 (2d Cir. 2009). It is not enough that Plaintiff offer evidence suggesting that S&W's reason for terminating her employment was pretextual; Plaintiff must offer admissible evidence that the reason was also a pretext for discrimination.  The points raised by Plaintiff and referenced by the Court were insufficient as a matter of law to permit Plaintiff to carry this burden.

---

[5]      Deposition pages from the deposition of Plaintiff are attached as Exhibit B to the Declaration of L. Lynnette Sarno, dated August 7, 2009, submitted in support of S&W's motion for summary judgment.

The Order makes clear that the "same facts that give rise to genuine issues of material fact as to [Plaintiff's] *prima facie* claim also give rise to questions as to whether the proffered reason for her termination was really a pretext for discrimination based on her race or national origin." (Order at 20). Although the Court correctly noted that a plaintiff may in some cases rely on the same evidence at the pretext stage as she did at the *prima facie* stage to avoid summary judgment, this maxim holds true only where the evidence at the *prima facie* stage is of such a character that it is sufficient to prove that the plaintiff was the victim of unlawful discrimination. See James v. New York Racing Ass'n, 233 F.3d 149, 154-57 (2d Cir. 2000) (holding that the evidence relied on at the *prima facie* stage may be sufficient at the pretext stage provided it sufficiently demonstrates on its own that the adverse employment action occurred for discriminatory reasons); Wilson v. N.Y.P. Holdings, Inc., No. 05 Civ. 10355 (LTS), 2009 WL 873206, at *17 (S.D.N.Y. Mar. 31, 2009) ("A plaintiff may rely at the rebuttal stage on the same facts used to establish the *prima facie* case so long as a preponderance of the evidence would allow a reasonable fact finder to find that a discriminatory violation has occurred."); Hammer v. FedEx, No. 07 Civ. 1445 (BMC), 2008 WL 2220029, at *2 (E.D.N.Y. May 28, 2008) ("A plaintiff is of course entitled to rely on the same evidence that makes his *prima facie* case . . . . [h]owever, when the facts supporting the fourth prong of the *prima facie* test barely meet the threshold, it leaves, a plaintiff's case vulnerable.") (citation omitted). Indeed, James clearly articulates the diverging burdens a plaintiff faces at the *prima facie* stage of her case versus the pretext stage:

> At the outset, a plaintiff can avoid dismissal by presenting the "minimal" *prima facie* case defined by the Supreme Court in McDonnell Douglas. This requires no evidence of discrimination. . . .[O]ur holding in Fischer was that once the employer has proffered a reason for its action, all presumptions and special rules drop away . . . . the standard for determining whether the evidence was sufficient to sustain the submission

of plaintiff's case to the jury was simply whether on the basis of that evidence, a factfinder could reasonably find the essential elements of a case of discrimination. The essential point of our ruling was that <u>employers should not be held liable for discrimination in the absence of evidence supporting a reasonable finding of discrimination</u>.

233 F.3d at 154-55 (emphasis added). Thus, for example, whereas evidence such as discriminatory comments may suffice to establish an inference of discrimination at the *prima facie* stage <u>and</u> establish intentional discrimination at the pretext stage, weak evidence concerning the allegedly disparate treatment of similarly situated employees may suffice <u>only</u> for the *prima facie* case and falls far short of evidencing intentional discrimination at the pretext stage. <u>See</u>, <u>e.g.</u>, <u>Griffin v. TNT Int'l Express</u>, No. 05 Civ. 10475 (PKC), 2008 WL 697680, at *11 (S.D.N.Y. Mar. 12, 2008) (granting summary judgment and stating: "plaintiff's evidence of pretext relies principally on the same evidence used to establish his *prima facie* case. There is no evidence that anyone in a supervisory position ever made any racial comments").

Here, because the Court relied on the same facts at the pretext stage as it did at the *prima facie* stage, the Court necessarily relied on only: (i) the competing evidence bearing on S&W's legitimate and non-discriminatory reason for Plaintiff's termination; (ii) the statistical evidence underlying the Court's determination that Plaintiff was terminated under circumstances giving rise to an inference of discrimination; and (iii) the incorrect assumption that the next associate hired at S&W was Caucasian. (Order at 18-19). This evidence, both independently and collectively, is insufficient as a matter of law to establish that Plaintiff was terminated for unlawful discriminatory reasons for the same reasons set out above (<u>supra</u> at 5-7), and it is thus necessarily insufficient to establish intentional discrimination at the pretext stage where Plaintiff's burden is even more onerous. <u>See</u> <u>Uribe v. Kellogg's Snacks/Keebler, Inc.</u>, No. 05 Civ. 02959 (PKG), 2009 WL 1098369, at *5-6 (S.D.N.Y. Apr. 22, 2009) (granting summary judgment and declining to find pretext where plaintiff sought to rely on same evidence at pretext

stage that was found insufficient at *prima facie* stage); Torres v. Do It Best Corp., No. 07-CV-230 (CS), 2008 WL 4974588, at *10 (S.D.N.Y. Nov. 24, 2008) (same).

Furthermore, it is insufficient at the pretext stage for Plaintiff to argue that a trier of fact could disbelieve S&W's proffered reason for her termination (i.e., her performance); rather, Plaintiff must adduce evidence establishing that intentional discrimination, and not some other reason, motivated her termination. See, e.g., Crawford, 324 Fed. Appx. at 141-42; Galimore v. City Univ. of N.Y., 641 F. Supp. 2d 269 (S.D.N.Y. 2009); Bryant v. Verizon Commc'n, Inc., 550 F. Supp. 2d 513, 534-35 (S.D.N.Y. 2008) (granting summary judgment and stating: "A reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."); Whaley v. City Univ. of New York, 555 F. Supp. 2d 381, 407 (S.D.N.Y. 2008) ("It is not enough to disbelieve the employer; the Court must also believe the plaintiff's explanation of intentional discrimination."). And aside from the statistics, Plaintiff failed to provide the Court with any evidence capable of meeting her burden.

Indeed, as noted above (supra at 5-8), the statistical evidence relating to the composition of S&W's associate workforce at large or the fact that the two black corporate associates had performance problems without any context or expert analysis fails to offer any insight into the individual circumstances of Plaintiff's own termination, which Plaintiff must prove occurred as a result of intentional discrimination to survive summary judgment.[6] See Zahorik v. Cornell Univ., 729 F.2d 85, 95 (2d Cir. 1984) (granting summary judgment and stating: "[E]ven if statistics [demonstrating disparate treatment of females] was sufficient by itself to permit a

---

[6] We again respectfully reiterate that the racial composition of S&W's workforce simply does not even hint at discrimination where: (i) S&W employed African-Americans at what appears clear to be a higher than expected rate based on the applicant pool; and (ii) Plaintiff failed to offer any evidence that would put this information in context, such as the number of African-American applicants. See Guider, 1998 WL 702275, at *11 (S.D.N.Y. Oct. 7, 1998) (discussing lack of probative value of statistics unaccompanied by context).

finding of discrimination against some women…such data would not be sufficient to prove that the particular plaintiffs" were discriminated against); <u>Lee v. Poughkeepsie City Sch. Dist.</u>, No. 06-CV-4660 (KMK), 2008 WL 852790, at *9 n.7 (S.D.N.Y. Mar. 31, 2008) (granting summary judgment and stating: "Statistics alone are insufficient in a disparate-treatment claim because an individual plaintiff must prove that he or she in particular has been discriminated against") (quotations omitted); <u>Drake v. Delta Air Lines</u>, No. 94-CV-5944 (FB), 2005 WL 1743816, at *6 (E.D.N.Y. July 21, 2005) (same), <u>aff'd</u>, 216 Fed. Appx. 95 (2d Cir. 2007); <u>Bussey</u>, 419 F. Supp. 2d at 583 (same). And, as noted above, Plaintiff's own testimony makes clear that even she believed that it was <u>not</u> her race, national origin, or gender that prompted her termination, but instead her unfounded belief was that S&W terminated her in collusion with Clifford Chance to retaliate against her for filing a complaint. (<u>Supra</u> at 8-9.)

Because the evidence put forward by Plaintiff is incapable of establishing pretext, S&W respectfully submits that the Court reconsider its Order and grant S&W summary judgment on Plaintiff's discrimination claim. <u>See</u>, <u>e.g.</u>, <u>Stoddard v. Eastman Kodak Co.</u>, 309 Fed. Appx. 475, 478 (2d Cir. 2009) ("[P]laintiff bears the ultimate burden of persuasion to prove intentional discrimination.").

### C. The Arguments Relied Upon By The Court In The Context Of Plaintiff's Performance Is Not Evidence, Cannot Support A Finding Of Pretext, And <u>Improperly Shifts The Burden To S&W</u>

The Order also strongly suggests that it considered the arguments by Plaintiff as to her alleged performance to support the finding that sufficient evidence existed to create an issue of fact with respect to pretext. Those arguments, however, were erroneously relied upon by the Court for several reasons. First, they are nothing more than supposition – not evidence – and should not have been considered. For example, the Order relies heavily on Plaintiff's argument that Plaintiff "was able to take with her one of the clients [Wine Project Inc.] for whom she had

worked . . . which is 'highly unlikely' to have occurred if she was as incompetent as S&W now claims." (Order at 18-19). However, if Plaintiff wished to make this argument by way of admissible evidence, she could have easily submitted an affidavit from Wine Project Inc. evidencing the client's decision to go with Plaintiff because of her competence — she did not. Supposition as to the client's motivation is not evidence, particularly given that any assumed view by the client of Plaintiff's work product was based on product which was just as likely reviewed and edited by the partners for whom she worked before it went to the client. Moreover, the error of the supposition that Plaintiff was "highly unlikely" to be incompetent is even further made clear from the recent discovery that Wine Project, Inc. is accusing and suing Plaintiff of legal malpractice and churning, a fact that was unknown to S&W or the Court at the time of summary judgment and of which the Court may take judicial notice. See Global Network Commc'n Inc. v. City of N.Y., 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings.").[7] Specifically, Wine Project is counter-suing Plaintiff for legal malpractice and churning because Plaintiff estimated that she would obtain licenses for Wine Project to distribute wine and other products at a bargain basement cost of $2,000 – just as obviously the reason why this client went with Plaintiff – only to have Plaintiff bill that client more than $38,000 for these services – more than nineteen times her estimate. See Memnon v. Wine Project, Inc., Index No. 044300 (N.Y. Civ. Ct. 2009). Plaintiff's reliance on supposition as to the reasons for a client's departure to Plaintiff is not evidence of performance, nor does it remotely support a finding of pretext.

---

[7] For the Court's convenience, we attach hereto as Attachment B a copy of excerpted relevant pleadings obtained from the Civil Court for the State of New York.

Furthermore, the suggestion that "the record in this case is devoid of any contemporaneous writings – be they internal memoranda, emails or diary entries – that show any indication that anyone was dissatisfied with [Plaintiff's] performance" (Order at 18), even while the Court acknowledged that "this may well have been because there had been no formal reviews or evaluations in the few weeks that Memnon was employed at S&C [sic]" (id.), improperly shifted the burden of persuasion to S&W to prove that its reasons were not pretextual, rather than compelling Plaintiff to prove the falsity of the reason.  See Ste. Marie v. Eastern R. Ass'n, 650 F.2d 395, 398 (2d Cir. 1981) (reversing district court's denial of summary judgment where district court required employer to disprove plaintiff's *prima facie* case as an impermissible shifting for the burden of persuasion to the employer); see also Skelton v. Sara Lee Corp., 249 Fed. Appx. 450, 458-59 (6th Cir. 2007) (reversing the district court where the court considered evidence of defendant's legitimate non-discriminatory reason for adverse employment action in determining whether plaintiff adduced sufficient evidence to establish *prima facie* case); Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 574 (6th Cir. 2003) (same).  And, even assuming *arguendo* that Plaintiff could offer evidence of her positive performance, it still does not offer any evidence that the real reason for her termination was unlawful discrimination based on her race, national origin, or gender.[8]

**D.    Summary Judgment Should Have Been Granted Based As Well Upon The Same-Actor Defense.**

All apart from Plaintiff's failure to offer evidence that could support her claims of discrimination, the Court declined to give weight to the extraordinary evidence that the very

---

[8]    As noted above (supra at 8-9), when Plaintiff was questioned about evidence of such discrimination, she did not point to any discriminatory comments or treatment (there was none), but instead to her unfounded belief that the real reason for her termination was that S&W somehow "colluded with Clifford Chance based on a discrimination complaint that I made at Clifford Chance with regards to my national origin, my gender, and my race."

NY1 26595755.5

same individuals who made the decision to terminate Plaintiff had made the decision to hire her just six weeks earlier, i.e., the "same-actor" defense. (Order at 19). The Court's decision in this regard rested first on its conclusion that while Jenkins, Lindsay, Bidwell and Coultrap made the decision to hire Plaintiff, while Jenkins, Lindsay, Bidwell, Coultrap and *Goss and Barnard* allegedly made the decision to terminate Plaintiff. (Id.) However, the Court overlooked the undisputed evidence that in fact, Goss <u>was</u> involved in the hiring of Plaintiff as he interviewed her at the very outset. (S&W Stmt. Fact ¶ 23). As such, he was indeed involved both in the hiring and termination decision, removing the Court's reason for declining to apply the "same actor" inference.

Second, although the Court correctly noted that Ms. Barnard did not have input into the hiring decision, the Court erroneously found that she was involved in the decision to terminate Plaintiff, when in fact the undisputed evidence makes clear that she was merely informed her after the decision had already been reached. (S&W Stmt. Fact ¶ 56; Jenkins Tr. at 78:3-21).[9] Under such circumstances, where Barnard cannot be characterized as a decision-maker, there is no basis to vitiate application of the "same actor" inference. See <u>Muhleisen v. Wear Me Apparel LLC</u>, No. 07 Civ. 8748 (NRB), 2009 WL 2355784, at *8 (S.D.N.Y. July 30, 2009) (finding mere consultation with another manager concerning termination decisions insufficient to render other manager a decision maker); <u>DeLuca</u>, 2008 WL 857492, at *8. Moreover, even if Barnard had played a substantive role in the termination decision — she did not — the inference is still available with equal force so long as there were a significant number of the "same actors" involved in both decisions. See <u>Dorcely v. Wyandanch Union Free Sch. Dist.</u>, No. 06-Civ-1265 (DRH), 2009 WL 3232866, at *15 (E.D.N.Y. Sept. 30, 2009) (granting summary judgment and

---

[9]     The pages of the deposition of Jay Jenkins are attached to the Sarno Declaration as Exhibit D.

holding: "the same actor inference 'may be applied even when the supervisor at issue . . . is not the only person with input into the hiring and firing decision.' The inference 'is applicable so long as one management-level employee played a substantial role in both the hiring and firing of the plaintiff'") (citation omitted); Jones v. Yonkers Public Sch., 326 F. Supp. 2d 536, 546 (S.D.N.Y. 2004) (same). Here, even assuming Barnard was a decision-maker, five of the six decision-makers participated in both decisions.

In any event, the Court concluded that the same-actor defense was permissive, and elected not to apply it. (Order at 19.) S&W respectfully submits that while the "same actor" inference is in some sense permissive, the courts in the Second Circuit have declined to apply it only for a significant reason, e.g., where there is also evidence that the "same actor" later uttered discriminatory comments, undermining the basis for the inference's application, or where the two decisions made by the "same actor" are too temporally attenuated to support its application. See Smith v. Tuckahoe Union Free Sch. Dist., No. 03 Civ. 7951 (PGG), 2009 WL 3170302, at *8 (S.D.N.Y. Sept. 30, 2009) ("The same-actor inference is not dispositive, however, when the decisionmaker makes comments demonstrating discriminatory animus."); Bookman v. Merrill Lynch, No. 02 Civ. 1108 (RJS), 2009 WL 1360673, at *14 (S.D.N.Y. May 14, 2009) ("Simply put, in light of the evidence in the record of discriminatory comments . . . the application of the 'same actor' inference at this stage" is improper); Allen v. J.P. Morgan Chase & Co., No. 06 Civ. 8712 (JGK), 2009 WL 857555, at *10 (S.D.N.Y. Mar. 31, 2009) ("However, this 'same actor inference' is 'less compelling when a significant period of time elapses between the hiring and firing.'") (citation omitted). Indeed, upon a review of the two cases cited in the Order on this point, the courts there specifically noted the presence of other exacerbating evidence, which simply is not present here. See Braunstein v. Barber, No. 7:06-Civ.-5978 (CS), 2009 WL

849589, at *9 (S.D.N.Y. Mar. 30, 2009) (report and recommendation), adpt'd 2009 WL 1542707, at *1 (S.D.N.Y. June 2, 2009) ("The same-actor inference is not dispositive, particularly where, as here, there is evidence that such actor made comments that could be construed as overtly discriminatory."); Copeland v. Rosen, 38 F. Supp. 2d 298, 306 (S.D.N.Y. 1999) ("It may be the case that reliance on the 'same actor' inference at the summary judgment stage would be appropriate. . . . In the instant case, however, plaintiff has proffered ample other evidence supporting his allegations of race and sex discrimination.").

Here, there is no evidence of any discriminatory comments warranting the Court in declining to apply the same actor defense. Moreover, the decision to fire Plaintiff, far from being too attenuated from the decision to hire Plaintiff, in fact occurred just six weeks apart. The Second Circuit and New York District Courts have repeatedly and recently held that application of the same-actor inference is a near compulsion where the two decisions occur so close together. See Cordell v. Verizon Commc'n, Inc., 331 Fed. Appx. 56, 58 (2d Cir. 2009) (citing Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997) and holding that the same-actor inference "remains a highly relevant factor in adjudicating a motion for summary judgment," and that "this is especially so when the firing has occurred only a short time after the hiring"); Dorcely, 2009 WL 3232866, at *15 (four weeks); Noble, 2009 WL 2391864, at *9 (five months); Kolesnikow v. Hudson Valley Hosp. Ctr., 622 F. Supp. 2d 98, 113 (S.D.N.Y. 2009) (eighteen months). Moreover, where a plaintiff's *prima facie* and pretext cases are weak, as they are here as outlined above, the Court should credit any evidence produced by S&W that tends to disprove discrimination. See Schnabel v. Abramson, 232 F.3d 83, 91 (2d Cir. 2000) (affirming summary judgment for employer where plaintiff offered evidence showing pretext, but same-actor inference and evidence of legitimate motives defeated any inference of discrimination).

18

As such, and for all of the reasons set out in S&W's moving and reply papers on its motion for summary judgment, S&W respectfully requests the Court reconsider its decision and grant summary judgments to S&W on Plaintiff's remaining discrimination claims.

## <u>CONCLUSION</u>

For each of these reasons, S&W respectfully requests that the Court reconsider its Order and grant S&W summary judgment dismissing Plaintiff's claims in their entirety.


Dated: New York, New York
      November 9, 2009

SEYFARTH SHAW LLP

By: <u>s/ Dov Kesselman</u>
      Dov Kesselman (DK-6571)
      Anjanette Cabrera (AC-3922)
      620 Eighth Avenue, 32nd Floor
      New York, New York 10018
      Tel: 212-218-5500
      Fax: 212-218-5526
      Email: dkesselman@seyfarth.com

NY1 26595755.5

# ATTACHMENT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------------------x
CAROLINE MEMNON,      :
              :
        **Plaintiff,**   :   08 Civ. 2874 (HB)
              :
    -against-     :   **OPINION & ORDER**
              :
CLIFFORD CHANCE US, LLP and :
SULLIVAN AND WORCESTER, LLP, :
              :
       **Defendants.**  :
---------------------------------------------------------------------------x
**Hon. HAROLD BAER, JR., United States District Judge:**

   On July 2, 2009, Plaintiff Caroline Memnon ("Memnon" or "Plaintiff") filed her Third Amended Complaint against Defendants Clifford Chance US LLP ("Clifford Chance") and Sullivan & Worcester, LLP ("S&W") (collectively, "Defendants") alleging various claims arising out of her separation from her former employer Clifford Chance and her subsequent hiring and termination from S&W.  Specifically, based on allegations that Clifford Chance "blackballed" her by providing "back channel" negative information to prospective employers and "blacklisted" her by failing to provide an agreed-upon letter of recommendation, Memnon brings claims against Clifford Chance for employment discrimination and retaliation under Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1981, N.Y. Exec. Law, Article 15, § 296 ("NYSHRL"), Human Rights Law of New York City, §§ 8-107 and 8-502 ("NYCHRL"), breach of contract and tortious interference with business relations.  As against S&W, Memnon brings claims for retaliation and discriminatory wrongful termination under Title VII, § 1981, NYSHRL and NYCHRL.  Defendants now move for summary judgment on all claims.  For the reasons set forth below, some of the claims are granted and others denied.

# I.  <u>FACTUAL BACKGROUND</u>[1]

   Plaintiff is an African-American woman of Haitian descent.  After emigrating to the United States, Plaintiff completed her undergraduate degree at Cornell University in 1993 and graduated from Columbia University School of Law and the Columbia School of International and Public Affairs in 2000 after having transferred from Vanderbilt Law School after her first year.  In the fall of 2000, Plaintiff began her employment as a full-time associate at Clifford Chance.  After having

---

[1] On summary judgment, all inferences must be drawn in favor on the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Accordingly, unless otherwise indicated, this section is based on Plaintiff's Response to Defendant's Rule 56.1 Statement.

made complaints to Clifford Chance management of perceived discriminatory practices, Memnon resigned effective September 1, 2002 pursuant to a Settlement Agreement. James Paul, General Counsel of Clifford Chance, negotiated and drafted the Settlement Agreement on the firm's behalf. Under the terms of the settlement agreement, Plaintiff received substantial monetary payments and other benefits from Clifford Chance, including a lump sum payment, contributions to her tax-deferred savings plan, COBRA health insurance contributions through August 2003, contributions toward outplacement services and reimbursement of legal fees. *See* Declaration of Bettina Plevan ("Plevan Decl.") Ex. 9 ¶ 2-7. Clifford Chance also agreed to provide Memnon "with a letter of recommendation substantially in the form of the letter attached [to the Agreement] as Exhibit A," but no letter was ever attached to the Agreement. *Id.* ¶ 5. Clifford Chance contends that it was Paul's understanding that Memnon would obtain a recommendation letter from a lawyer with whom she had worked and who was familiar with her work product; Memnon disputes this contention and maintains that the firm was to provide the letter of recommendation.[2] In addition to a general release of all claims "from the beginning of the world to [September 1, 2002]," *id.* ¶ 8, the Settlement Agreement contained an integration clause that stated that the agreement "represents the complete agreement between the parties," *id.* ¶ 14, and a provision that directed that any disputes over "the interpretation of or performance under" the Settlement Agreement are to be resolved in arbitration, *id.* ¶ 17.

Between 2003 and 2007, Memnon periodically worked in temporary positions she obtained through employment agencies, in addition to several non-legal jobs. During this time, she also sought employment with numerous law firms in New York, including Sullivan & Cromwell, LLP ("Sullivan & Cromwell"), Thacher Proffitt & Wood LLP ("Thacher Proffitt"), Chadbourne & Parke LLP ("Chadbourne"), Manatt, Phelps & Phillips, LLP ("Manatt"), DLA Piper, S&W and Simmons & Simmons. Memnon alleges that all of her interviews at these firms went extremely well, but she was not offered employment at any firm until early 2007, when she was offered a position at S&W. First, in September 2003, Memnon had an "informational" interview session with several associates at Sullivan & Cromwell. However, Memnon was never invited for an interview with any partner at Sullivan & Cromwell and neither she nor her recruiter was ever given any reason why no interview was ever scheduled. Although Plaintiff believes that

---

[2] Beginning in late 2002 or early 2003, and throughout the relevant time period, Memnon periodically requested that Clifford Chance provide the letter of recommendation, but no letter came until September 16, 2006, when Clifford Chance's counsel provided Memnon with a neutral letter of reference that summarized the dates of her employment and the type of work she had done while at the firm. Plaintiff rejected the proffered letter as "woefully inadequate."

Clifford Chance provided certain "negative and confidential" information to Sullivan & Cromwell that caused the latter firm to deny her an opportunity to interview for a position, she has no evidence to support this contention.  *See* May 5, 2009 Deposition of Caroline Memnon Transcript ("5/5/09 Dep. Tr.") at 82:18-83:9.

Plaintiff then interviewed with Thacher Proffitt some time in 2004, but was not invited for a callback interview and was never provided with a reason why no callback interview was ever scheduled.  In approximately April 2006, Memnon interviewed with Chadbourne twice.  Memnon claims that her recruiter informed her that Chadbourne would be making her an offer, but no offer was ever made and no reason was ever provided why Memnon was not given at offer at that firm.[3] Then in July 2006, Memnon had two sets of interviews at Manatt, but did not receive a job offer. According to documents produced by Memnon's recruiter, Manatt had mentioned various problems with Memnon's writing sample.  Thereafter, Memnon had several interviews at DLA Piper, which she claims were all positive, but she did not receive an offer from that firm.  The record reflects that Memnon's first-year law school transcript, which was provided to DLA Piper, contained several grades in the "C" range.  Plaintiff has conceded that she can identify no specific communications between any prospective employer and Clifford Chance, nor any information that Clifford Chance provided to any other law firm about Memnon.[4]

Finally, in late 2006 and early 2007, Memnon interviewed with S&W.  During the interview process, Memnon provided the names of two references, both of whom provided positive feedback on her behalf.  S&W offered Memnon a position as a fourth-year associate in its corporate department in the New York office, and Memnon began to work there on February 5, 2007.  The decision to hire Memnon was made jointly by Jon Jenkins, George Lindsay, Truman

---

[3] Although Plaintiff contends that Clifford Chance provided Chadbourne with negative information, presumably when Chadbourne called to check her references, a representative of Chadbourne testified that this could not have happened because, first, Chadbourne only checks references after an offer has been extended to a candidate and no offer was extended to Memnon, and second, when the firm does check references, they do so through a third-party service, and the firm has no record that any request was made for that service to contact Clifford Chance to check Memnon's references.  *See* Deposition Transcript of Lisa LaVerde-Featherson ("LaVerde-Featherson Dep.") at 36:6-37:15.

[4] Sullivan & Cromwell, Thacher Proffitt, Chadbourne, Manatt and DLA Piper all produced numerous documents in response to subpoenas in this matter, but none of the documents gives any indication that information about Memnon was provided by Clifford Chance to anyone at the other firms.  Plaintiff's responses to Clifford Chance's Local Rule 56.1 statement contend that she "lacks sufficient information to admit or deny" Clifford Chance's contention that none of the documents produced by any firm with which she sought employment reveals any communication with Clifford Chance.  However, "[s]uch statements do not create genuine disputes of fact."  *Toyomenka Pacific Petroleum, Inc. v. Hess Oil Virgin Islands Corp.*, 771 F. Supp. 63, 66-67 (S.D.N.Y. 1991).  Nonetheless, the Court has carefully reviewed all of the documents submitted as having been produced pursuant to subpoena from the various law firms with which Memnon sought employment and has confirmed that none of these files makes any reference to any communication with Clifford Chance.

Bidwell and Martha Coultrap, all partners in S&W's New York office. After she began work at S&W, Memnon requested from Clifford Chance's counsel a copy of the Settlement Agreement, which was mailed to her at her work address; the envelope was sealed when she received it. S&W contends that in only a few weeks of working there, several partners experienced disappointment in Memnon's performance and contends that she demonstrated unfamiliarity with basic principles that any mid- to senior-associate would be expected to know. Memnon vehemently disputes these characterizations of her work, noting that she was never informed of any sub-par work product, that she consistently sought evaluations and was told that her work was satisfactory, and that the proof of the pudding was that when she left S&W, one of the firm's clients for whom she had worked went with her. *See* Declaration of Caroline Memnon ("Memnon Decl.") ¶ 31b-37. In any event, on March 22, 2007, only 7 weeks after she began to work at S&W, Jenkins informed Plaintiff that she was terminated effective immediately. The decision to fire Memnon was made by Jenkins in consultation with Lindsay, Bidwell and Coultrap, as well as David Goss, a partner in S&W's New York office and Susan Barnard, a partner in the firm's Boston office. Plaintiff concedes that she can point to no specific communications between anyone at S&W and anyone at Clifford Chance, nor can she identify any information that was passed from her former employer to S&W.

In 2008, Memnon applied for a position in the Paris office of Simmons & Simmons and was given an offer to join the firm as an associate, which she accepted. *See* May 4, 2009 Deposition of Caroline Memnon Transcript ("5/4/09 Dep. Tr.") at 270:15-271:22. Memnon contends that Simmons & Simmons rescinded her offer right before she was supposed to receive her visa and "one or two days approximately" after she filed her complaint in this action. She believes that this action was the result of negative information communicated to Simmons & Simmons by Clifford Chance. *Id.* at 273:1-10; Plevan Decl. Ex. 11 ¶ 25.

## II. <u>LEGAL STANDARD</u>

A motion for summary judgment must be granted if the moving party shows "there is no genuine issue as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In showing

the existence of a genuine issue of material fact, "the non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *Golden Pac. Bancorp v. F.D.I.C.*, 375 F.3d 196, 200 (2d Cir. 2004). Rather, she "must come forward with evidence sufficient to allow a reasonable jury to find in her favor." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001); *see also* Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in [the] rule, . . . the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial."). The facts presented must be in a form that would be admissible at trial. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Even if the parties dispute material facts, summary judgment must be granted "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

It has oft been noted that courts should be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). However, summary judgment in a discrimination case "may still be appropriate if the plaintiff relies on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." *Figueroa v. New York City Health & Hosps. Corp.*, 500 F. Supp. 2d 224, 228 (S.D.N.Y. 2007). "Indeed, the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trial – apply no less to discrimination than to commercial or other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ("Trial courts should not treat discrimination differently from other ultimate questions of fact.").

### III. <u>DISCUSSION</u>

A.    **MEMNON'S CLAIMS AGAINST CLIFFORD CHANCE**

*1. <u>Discrimination and Retaliation</u>*

At the outset, it is worth noting that, because many of Memnon's allegations concern conduct that occurred in 2002 or shortly thereafter, a good number of her claims for discrimination and retaliation likely are time-barred under the applicable statutes of limitations. *See* 42 U.S.C. § 2000e-5(e)(1) (300-day statute of limitation); *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382-83 (2004) (applying four-year statute of limitation to § 1981 claims); N.Y. CPLR § 214(2) (establishing three-year statute of limitation for NYSHRL claims); N.Y.C. Admin. Code § 8-502(d) (establishing three-year statute of limitation for NYCHRL claims). However, as will be

discussed in detail in the sections that follow, I find that upon a review of the merits of Plaintiff's claims against Clifford Chance under these statutes, none can survive summary judgment. Accordingly, I need not enter the quagmire of determining which, if any, of Plaintiff's claims might be time-barred, or which, if any, might be subject to the continuing-violation doctrine.[5]

### (a) *Legal Framework*

Each of Memnon's claims for discrimination and retaliation is analyzed under the now-familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Kemp v. Metro-North R.R.*, 316 Fed. Appx. 25, 26 (2d Cir. 2009); *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94 (2d Cir. 2001). *Pacheco v. New York Presbyterian Hosp.*, 593 F. Supp. 2d 599, 610 n.4 & n. 17 (S.D.N.Y. 2009). To survive summary judgment under this analysis, a plaintiff must adduce sufficient evidence for a reasonable fact finder to conclude that she has established her *prima facie* claim of either discrimination or retaliation. On a discrimination claim, a plaintiff establishes her *prima facie* claim by showing that she (1) is a member of a protected class; (2) is qualified for her position; (3) has suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discriminatory intent. *See McDonnell Douglas*, 411 U.S. at 802.[6] On a retaliation claim, to establish her *prima facie* claim a plaintiff must show that (1) she had engaged in a protected activity of which the defendant was aware, (2) she was subject to an adverse employment action, and (3) there was a causal nexus between the protected activity and the adverse action taken. *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005); *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999).

Once the plaintiff has satisfied this "minimal" initial burden, the burden of going forward shifts to the defendant to provide a legitimate non-discriminatory reason for the adverse employment action. *See, e.g.*, *Patterson*, 375 F.3d at 221. The defendant's burden in this regard is only one of production, not of persuasion. That is, the defendant need only articulate a nondiscriminatory purpose supported by admissible evidence that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action;

---

[5] As the statute of limitations is merely an affirmative defense, and not a jurisdictional element, *see Diaz v. Kelly*, 515 F.3d 149, 153 (2d Cir. 2008), it need not be resolved before reaching the merits of a claim. *See Peterson v. City College*, 32 F. Supp. 2d 675, 682 (S.D.N.Y. 1999).

[6] To establish a claim under § 1981, a plaintiff must show that (1) the defendant discriminated against her on the basis of race, (2) that discrimination was intentional and (3) the discrimination was a "substantial or motivating factor for the defendant's actions." *Tolbert v. Queens College*, 242 F.3d 58, 69 (2d Cir. 2001).

the defendant need not persuade the Court that the proffered purpose was in fact its reason for having taken the challenged employment action.  See *Fisher v. Vassar College*, 114 F.3d 1332, 1335-36 (2d Cir. 1998) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  The plaintiff then has an opportunity to demonstrate that the defendant's reasons were merely a pretext for discrimination or retaliation.  *Patterson*, 275 F.3d at 221.

### *(b)* *Employment Discrimination*

Memnon's employment discrimination claim appears to be premised on the same "blackballing" and "blacklisting" allegations that underlie her retaliation claims – that is, that Clifford Chance failed to provide a recommendation letter and provided negative information to prospective employers.[7]  Here, there appears to be no dispute that Plaintiff has established the first two elements of her *prima facie* employment discrimination claim as against Clifford Chance. Plaintiff fails on the third element: there has been no adverse employment action taken against her because all of the conduct that gives rise to her allegations against Clifford Chance occurred after she resigned pursuant to the Settlement Agreement.  In this Circuit, for conduct to constitute an adverse employment action in the discrimination context, it must be a "materially adverse change in the terms and conditions of employment."  *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000).  Plaintiff's resignation from Clifford Chance pursuant to the Settlement Agreement was effective September 1, 2002, and the first act that she alleges was based on discrimination was the firm's failure to provide an appropriate letter of recommendation, which by definition occurred after the Settlement Agreement was executed and after her separation from the firm became effective.  Likewise, all acts of so-called "blackballing" occurred with respect to her attempts to secure other legal employment between 2003 and 2008, well after her employment with Clifford Chance had ended.

Plaintiff expressly concedes this point with respect to Title VII, but contends that the fact that her employment had ended does not preclude her claims under § 1981, NYSHRL or NYCHRL.  In support of her claim, Plaintiff points the court to language in the statutes to the effect that they prohibit discrimination against "any person."  However, Plaintiff overlooks express statutory language that indicates that the prohibition in each of the relevant statutes is imposed against an "employer" and disallows discrimination in the terms, conditions and/or

---

[7] This claim is not, therefore, premised on her termination from Clifford Chance.  Indeed, it appears that Memnon concedes that any such claim would be barred by the release provision in the Settlement Agreement, as she had previously made a wrongful termination claim against Clifford Chance in previous versions of her complaint, but has voluntarily dropped that claim in the Third Amended Complaint.

privileges of employment. *See* N.Y. Exec. Law § 296(1) (prohibiting action by "an employer" that constitutes discrimination "in terms, conditions or privileges of employment"); NYCHRL § 8-107 (same); *see also Patterson*, 375 F.3d at 224-25 (finding that § 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment, . . . and is applicable to a plaintiff complaining of discrimination during an employment period"). For this reason alone, Memnon's employment discrimination claims against Clifford Chance must fail. Additionally, even if she could establish that post-employment actions could qualify as adverse employment actions under the applicable statutes, Memnon's claim nonetheless would fail on the fourth prong of the *prima facie* case, as she has come forward with no facts in the record that indicate that any of the post-employment actions were motivated by discriminatory animus based on her race, gender or national origin. For these reasons, Clifford Chance's motion for summary judgment on Plaintiff's employment discrimination claim is granted.

### *(c) Retaliation: Blackballing*

Memnon advances two different theories as the basis of her retaliation claims against Clifford Chance. The first of these theories is that Clifford Chance retaliated against her for having made complaints of discrimination by disseminating negative information about her to prospective employers and thus interfering with her ability to obtain employment at any other firm. Once again, there appears to be no dispute as to at least some of the elements of Memnon's *prima facie* retaliation claim: she clearly had engaged in a protected activity by making complaints of discriminatory treatment to Clifford Chance, and Clifford Chance surely was aware of that protected activity. Where Memnon's claim falters is on the adverse employment action element.

Under the Supreme Court's recent holding in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), the spectrum of conduct that can qualify as an adverse employment action in the context of a retaliation claim is considerably broader than in the discrimination context. Specifically, an adverse employment action in the retaliation context need not affect the terms and conditions of employment, but rather need only be harmful to the point that they are likely to dissuade a reasonable employee from making or supporting a charge of discrimination. *Id.* at 57, 64, 68. There is substantial support in the case law of this Circuit that a former employer's spreading of negative information or references to a prospective employer is sufficient to constitute an adverse employment action in the retaliation context. *See, e.g.*, *Sarno*, 183 F.3d at 155; *Hollander v. American Cyanamid Co.* 895 F.2d 80, 85-86 (2d Cir. 1990).

However, I need not decide definitively whether such an action falls within the purview of an adverse employment action because, even if it was found to be sufficient, Memnon has produced not a scintilla of evidence that any such negative information or references were actually disseminated by Clifford Chance to any prospective employer. Indeed, at oral argument on the instant motion, Plaintiff's counsel conceded that the record reveals no evidence of any conversation between anyone at Clifford Chance and any firm that interviewed Memnon, or any information that she alleges Clifford Chance communicated to these firms, and that the only indication that Plaintiff has that any such communication occurred was that job opportunities which had appeared promising "mysteriously" disappeared.[8] *See* September 29, 2009 Hearing Transcript ("9/29/09 Tr.") at 35:13-23.[9] As discussed below, there is likewise no evidence that there was any communication between Clifford Chance and S&W that caused S&W to terminate Memnon's employment. Moreover, Plaintiff herself essentially conceded that she lacks such evidence; she testified that she could not possibly know whether there were any communications between the firms, how those communications were made or what they entailed, because she is "not a fly on the wall." 5/5/09 Dep. Tr. at 107:5-9; 108:3-5; 121:12-17; 149:7-18; 5/4/09 Dep. Tr. at 219:6-8. This, however, is hardly enough to raise a genuine issue of material fact. There is no evidence here from which a reasonable juror could conclude that Clifford Chance took any affirmative actions against her or had any communications with any of Memnon's prospective employers, and for this reason alone her claim based on a "blackballing" theory must fail. *See, e.g.*, *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) ("A Plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn.") (quoting *Little v. New*

---

[8] The record reflects three requests for information regarding Plaintiff's employment at Clifford Chance – two in January 2004 and one in May 2007. *See* Declaration of John Christian ("Christian Decl.") Exs. A-C. Clifford Chance's responses to these three requests illustrates the firm's policy to provide only a confirmation of titles and dates of employment. *See id.* The existence of these records therefore illustrates that if Clifford Chance had received any request for information or references from any firm with which Memnon sought employment, there would have been a record of any such request.

[9] The colloquy between the Court and Plaintiff's counsel at the oral argument could not have been more plain:

> THE COURT: But just tell me whether you can point for me in the record to show any evidence of any conversation or a single conversation between anyone at [Clifford Chance] and any firm that interviewed [Memnon] . . . or any information that she alleges that [Clifford Chance] communicated to these firms. Have you got anything to show me on that?

> MR. DOMAN: Other than the fact that the law firms mysteriously ended their relationship with her, no, I don't have any evidence.

*York*, 96 CV 5132 (SJ), 1998 U.S. Dist. LEXIS 21797, at *14-15 (E.D.N.Y. June 8, 1998), *aff'd*, 1999 U.S. App. LEXIS 7768 (2d Cir. April 14, 1999)).

Moreover, even if Memnon could muster some evidence to show that the communications had occurred, her claim would fail because there is no evidence that any statements by Clifford Chance caused or contributed to any prospective employer's decision to reject her application. *See Sarno*, 183 F.3d at 155 ("Where . . . there is no admissible evidence that the statements of the former employer caused or contributed to the rejection by the prospective employer, the plaintiff has failed to present a prima facie case."); *see also Hollander*, 895 F.2d at 85-86; *Hamilton v. Bally of Switzerland*, No. 03 Civ. 5685 (GEL), 2005 WL 1162450, at *12 (S.D.N.Y. May 17, 2005) (Lynch, J.). In fact, the record reflects that each firm had documented legitimate reasons for rejecting Memnon. *See, e.g.*, Plevan Decl. Ex. 14 at SC-CM 00002, SC-CM 00027 (noting law school grade-point average); *id.* Ex.15 at S00713, S00714, 00716 (noting lack of experience and enthusiasm); *id.* Ex. 16 at CP023, CP 097 (Chadbourne interviewers noting lack of experience); *id.* Ex. 17 at S00638 (noting Memnon's references played no role in Manatt's decision not to offer employment), *cf. id.* at S00642 (noting both of Memnon's references were positive).

In sum, based on the undisputed record facts, Memnon has been unable to unearth any evidence to support the allegations of the so-called "blackballing" made in her complaint. She has thus failed to raise any genuine issue of material fact from which a reasonable jury could find in her favor on her retaliation claim that is premised upon such conduct. Under these circumstances, Clifford Chance's motion for summary judgment on Memnon's retaliation claim, insofar as it is premised on Clifford Chance having provided negative information to her prospective employers, must be granted.

### (d) *Retaliation: Failure to Provide Recommendation Letter*

A separate theory for Memnon's retaliation claim against Clifford Chance involves the firm's failure to provide her with a recommendation letter in the form she expected pursuant to the Settlement Agreement. As above, Memnon has established that she had engaged in a protected activity of which Clifford Chance was aware. In addition, the withholding of a recommendation letter likely is an adverse employment action in the retaliation context. Therefore, Memnon has established the first two elements of her *prima facie* claim. However, with respect to the causation prong of the *prima facie* claim, the only evidence Memnon presents is the temporal proximity between her protected activity (*i.e.*, her October 18, 2001 and July 29, 2002 letters to Clifford Chance management complaining of discriminatory treatment, *see* Declaration of Rebecca

Berkebile Ex. 2) and Clifford Chance's failure to provide the recommendation letter. *See* 9/29/09 Tr. at 31:22-32:3 (relying on timing to support retaliation claim). While temporal proximity can, in appropriate circumstances, provide sufficient evidence of causation to support a *prima facie* claim of retaliation, it is not at all clear here whether the time that elapsed between Plaintiff's complaints of discrimination and Clifford Chance's failure to provide the required letter is sufficient in itself to satisfy this element. That is, Memnon's evidence itself is vague as to the timing of her request for the letter, but her Declaration states that she first requested it in "late 2002 and January 2003." Memnon Decl. ¶ 14. It is unclear whether this period of time, in itself, is sufficient to establish causation. *See Hollander*, 895 F.2d at 84-86 (three and a half months between protected activity and adverse action insufficient to establish causation); *Garrett v. Garden City Hotel, Inc.*, No. 05 Civ. 0962, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) ("[D]istrict courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation.") (collecting cases). However, viewing the evidence in the light most favorable to the Plaintiff, as I must, the evidence could be seen as indicating that Clifford Chance's failure to provide the letter began immediately upon execution of the Settlement Agreement on September 13, 2002. The time elapsed between this failure and the protected activity, approximately 6 weeks, could be seen as sufficient to satisfy the causation prong of the *prima facie* claim.

However, irrespective of whether Plaintiff can satisfy her burden on one or more of the prongs set out in the *McDonnell Douglas* analysis, her claim must fail because she has not come forward with any evidence to suggest that Clifford Chance's proffered legitimate reason for not providing the letter is pretextual. Clifford Chance has articulated two related reasons for not having provided the letter. First, Clifford Chance avers that the letter was not provided because the form and content of the letter had not been agreed to prior to execution of the Settlement Agreement. Second, Clifford Chance contends that James Paul, who was to provide the letter to Memnon and who had not previously worked with her and was not familiar with her work, believed that Memnon would obtain the letter from a partner with whom she had worked while employed. As will be discussed in detail below, these reasons cannot support summary judgment on the breach of contract cause of action; however on a retaliation claim, all the defendant need do is articulate a legitimate purpose, it need not prove that it was actually the reason for its actions. Thus, these two proffered reasons are sufficient and the burden then shifts back to Memnon and she must show that these proffered reasons are merely a pretext for retaliation. However,

Memnon has come forward with no such evidence, other than the same temporal proximity that she contends supports her *prima facie* claim, that these proffered reasons were not the actual reasons for Clifford Chance's failure to provide the letter.  It is well-established in this Circuit that "without more, . . . temporal proximity is insufficient to satisfy [a plaintiff's] burden."  *Simpson v. New York. State Dep't Servs.*, 166 Fed. Appx. 499, 502 (2d Cir. 2006) (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir. 1998)).  Having provided no other evidence of pretext, and the Court having found none after scouring the record, Clifford Chance's motion for summary judgment on Plaintiff's claim of retaliation based on Clifford Chance's failure to provide a letter of recommendation is granted.

### 2. *Breach of Contract*

Memnon's claim for breach of contract arises out of her argument that Clifford Chance failed to provide her with a positive recommendation letter as agreed to in the Settlement Agreement, and by making statements in violation of the confidentiality provisions of the Settlement Agreement.[10]  Clifford Chance makes two arguments in support of its motion for summary judgment on this claim: first, the claim should be dismissed because the Settlement requires that it be resolved in arbitration, *see* Plevan Decl. Ex. 9 ¶ 17, and second, that it was not required to provide any letter as a result of a failure adequately to incorporate the letter by reference into the Settlement Agreement.  Neither contention has merit.

#### (a) *Waiver of Arbitration*

Although courts recognize a strong federal policy in favor of arbitration, that policy is not without circumscription, and the Second Circuit has expressly found that even where parties have clearly and unambiguously agreed to submit to arbitration, "a party waives its right to arbitration when it engages in protracted litigation that prejudices the opposing party."  *PPG Indus., Inc. v. Webster Auto Parts Inc.*, 128 F.3d 103, 107 (2d Cir. 1997).  "[P]rejudice . . . refers to the inherent unfairness – in terms of delay, expense, or damage to a party's legal position – that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue."  *Doctor's Assocs., Inc. v. Distago*, 107 F.3d 126, 134 (2d Cir. 1997).  Whether a party has waived its right to arbitration is a fact-specific inquiry; there is no bright-line rule.  *Thyssen, Inc. v. Calypso Shipping Corp.*, 310 F.3d 102, 105 (2d Cir. 2005).  Waiver has been found when a party

---

[10] To the extent Memnon's breach of contract claim arises out of allegations of "blackballing" – that is, that Clifford Chance allegedly disseminated negative information about her to prospective employers and S&W – as discussed in detail above, there is a complete failure of proof as to these allegations.  Thus, as to this basis for her breach of contract claim, summary judgment must be granted.

has engaged in extensive pretrial discovery and forced its adversary to respond to substantive motions, delayed invoking arbitration rights, and engaged in discovery procedures not available in arbitration. *See, e.g., PPG Indus.*, 128 F.3d at 107. Thus, in determining whether a party has waived its right to arbitration, courts will consider such factors as (1) the time elapsed from the commencement of litigation, (2) the amount of litigation (including any substantive motions and discovery), and (3) proof of prejudice. *Id.*; *see also Doctor's Assocs.*, 107 F.3d at 131, 134; *Satcom Int'l Group PLC v. Orbcomm Int'l Parnters, L.P.*, 49 F. Supp. 2d 331, 340 (S.D.N.Y. 1999).

Here, there is no doubt but that Memnon's breach of contract claim is arbitrable under paragraph 17 of the Settlement Agreement;[11] however, the relevant question here is whether Clifford Chance has waived its right to arbitrate that claim. Memnon filed her initial complaint on March 18, 2008, in which she alleged breach of contract against Clifford Chance, among other causes of action. She then filed an Amended Complaint on July 14, 2008, nearly four months later. At no time during those four months did Clifford Chance demand arbitration of the breach of contract claim or otherwise indicate that it intended to assert its right to arbitration. Moreover, Clifford Chance declined the offer for alternative dispute resolution at the initial pretrial conference in this matter. In response to the Amended Complaint, Clifford Chance filed a motion to dismiss in which it asserted its right to arbitration, but it did not demand arbitration in accordance with the American Arbitration Association Rules or the Settlement Agreement, nor did it move to compel arbitration or to stay the remainder of this litigation pending arbitration. The motion to dismiss ultimately was not decided, as it was superseded by Plaintiff's Second Amended Complaint. Clifford Chance moved to dismiss the breach of contract claim, once again asserting its right to arbitration, yet it still had taken no steps to secure that right. *See Cotton v. Slone*, 4 F.3d 176, 179 (2d Cir. 1993) ("To avoid waiver… it is not enough merely to assert a right without taking appropriate steps to secure it."). Ultimately, due to the posture of the case and Plaintiff's motion for leave to file a third amended complaint (which was granted), Clifford Chance's second motion to dismiss also was not decided. Here again on summary judgment Clifford Chance repeats its argument that it is contractually entitled to arbitrate Memnon's contract claim. Throughout this year-long litigation, however, Clifford Chance went forward with substantial

---

[11] It is a district court's responsibility to decide first whether an underlying dispute is subject to arbitration. *See, e.g., Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 82 (2002); *Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 23 (2d Cir. 1995) (finding that "the task of determining whether a claim or set of claims 'arises out of or relates to' the particular contract in which the arbitration clause is found" is properly determined by the district court).

discovery, including third-party discovery and numerous depositions, interrogatories and requests for documents. While some third-party discovery may be permitted in arbitration, Clifford Chance does not contest that it was unlikely that it would be granted the breadth of discovery that it has received in this litigation. Moreover, if the contract claim were to go to arbitration, Memnon would be subject to piecemeal litigation of her claims that arise from the identical set of allegations,[12] and would be required to respond to potential new defenses of expiration of the statute of limitations or the equitable doctrine of laches. *See In re Citigroup*, 376 F.3d 23, 27 (1st Cir. 2004).

Here it is worth underscoring that there was no petition for an order to compel arbitration, no service of a demand for arbitration, not even a reference to § 7503 in the Defendant's papers. Further, the law provides that the moving party can proceed to arbitration regardless of the lack of response to a notice of intent, but that didn't happen here either. So far as I can tell, there was no more than a passing reference in any of the papers and no follow up until this motion. Under these circumstances, and it now being the eve of trial, I find there to be sufficient evidence of prejudice to support a finding that Clifford Chance has waived its right to arbitration of Memnon's claim for breach of the Settlement Agreement. *See Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 25 (2d Cir. 1995) (finding "[t]he proximity of a trial date when arbitration is sought is also relevant" to a determination of waiver).

### (b) *Merits of the Breach of Contract Claim*

Having determined that Clifford Chance waived its right to arbitrate the breach of contract claim, the Court turns to the merits of its motion for summary judgment on that claim. To succeed on a claim for breach of the Settlement Agreement, Memnon ultimately must prove (1) the existence of a contract; (2) breach of the contract by Clifford Chance; and (3) damages suffered as a result of the breach. *See National Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004). It is black-letter law that a court's "'fundamental objective' is to determine the intent of the contracting parties 'as derived from the language employed in the contract.'" *Consol. Edison, Inc. v. Northeast Utils.*, 426 F.3d 524, 527 (2d Cir. 2005) (quoting *Abiele Contracting v. N.Y. City Sch. Constr. Auth.*, 91 N.Y.2d 1, 9 (1997)). Where a contract is clear and unambiguous

---

[12] The Court is aware of the Supreme Court's instruction that courts are to "rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation, at least absent a countervailing policy." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1983). However, in circumstances such as those illustrated in this case, when one party to an agreement to arbitrate engages in substantial and protracted litigation to the detriment of its opponent, the doctrine of waiver is a sufficient "countervailing policy" to overcome the presumption in favor of enforcement of arbitration agreements.

on its face, the Court must determine the intent of the parties "from within the four corners of the instrument." *Id.* (citing *Meccico v. Meccico*, 76 N.Y.2d 822, 824 (1990)). However, when the terms of the contact are susceptible to more than one reasonable meaning, a court may consult parol evidence to determine the parties' intent. *See Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000).

Here, pursuant to the Settlement Agreement, Clifford Chance agreed to provide Memnon "with a letter of recommendation substantially in the form of the letter attached hereto as Exhibit A." Plevan Decl. Ex. 9 ¶ 5. However, no letter was ever attached to the Settlement Agreement, nor did the parties agree to the form or content of any letter of recommendation or reference. Accordingly, Clifford Chance argues that because the terms of the letter were never agreed upon, the recommendation letter did not become part of the Agreement and it therefore had no obligation to provide any letter at all. As if a surgeon might suggest to his patient that he won't do anything for a burst appendix and it will go away. The unambiguous language of the Settlement Agreement reflects that it was the parties' intent that Clifford Chance would provide a letter to Memnon. The fact that the letter was never attached or that the specific form or content of the letter was never agreed upon does not obviate Clifford Chance's obligation in this regard.[13] If anything, the failure to attach an agreed-upon recommendation letter in itself creates an ambiguity in the contract as to the type of letter that Clifford Chance was to provide.[14] Looking then to parol evidence, Clifford Chance avers that it was James Paul's understanding that Memnon was to secure her own letter of recommendation from a partner with whom she had worked, while Memnon strenuously disputes this understanding and the Defendant offers nothing to support its contention. Moreover, Clifford Chance contends that the substance of any letter would have been neutral in tone, while Plaintiff maintains the letter was to be strong and positive and was intended to encourage other firms to hire her. These questions, among others, create genuine questions of material fact as to whether the parties intended that Clifford Chance was obligated to provide a letter if the form and/or

---

[13] Clifford Chance contends that there was no meeting of the minds with respect to the letter of recommendation because the reference to an exhibit that was never attached does not have a "reasonably clear and ascertainable meaning" and therefore the letter never became part of the agreement. *See* 11 WILLISTON ON CONTRACTS § 30:25 (4th ed. Supp.). I disagree. The terms "attached hereto as Exhibit A" have a definite, precise and ascertainable meaning. Those terms would have referred unambiguously to any document that was attached as Exhibit A. The fact that no letter was ever attached does not detract from the clear terms that illustrate the parties' intent that a letter in some form was to be provided.

[14] Moreover, in any event, the failure to attach the letter of recommendation should be charged to Clifford Chance, the drafter of the Settlement Agreement. *See Torres v. Walker*, 356 F.3d 238, 246 (2d Cir. 2004) (citing *SOS Oil Corp. v. Norstar Bank of Long Island*, 76 N.Y.2d 561, 568 (1990)) (finding any ambiguity in a contract should be construed against the drafter).

content was not agreed upon prior to execution of the Settlement Agreement, and whether the term "letter of recommendation" necessarily meant a positive recommendation as Memnon contends, or whether a neutral letter of reference would have been sufficient. Moreover, there remains a genuine issue of fact as to whether Clifford Chance complied with its obligation, albeit belatedly, when it provided a neutral letter confirming Memnon's employment in September 2006. Accordingly, Clifford Chance's motion for summary judgment on Memnon's breach of contract claim, insofar as it is based on the failure to provide a letter of recommendation, must be denied.

### 3. *Tortious Interference with Business Opportunity*

Finally, Memnon's claim against Clifford Chance for tortious interference with prospective business relations also is premised on the same allegations of "blackballing" and dissemination of negative information as her retaliation claims discussed in detail above. To prevail on a claim for tortious interference with business relations, Memnon must establish that (1) she had a business relationship with a third party, (2) Clifford Chance knew of that relationship and intentionally interfered with it, (3) Clifford Chance's conduct amounted to "wrongful means," and (4) the interference caused injury to the business relationship. *See Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008). Plaintiff must also show that she "would have entered into an economic relationship but for the defendant's wrongful conduct." *Knight-McConnell v. Cummins*, No. 03 Civ. 5035(NRB), 2004 WL 1713824, at *4 (S.D.N.Y. July 29, 2004). In evaluating a claim for tortious interference, the wrongful conduct that is relevant that which was directed not at the plaintiff, but at the third party with whom the plaintiff has or seeks to have a relationship. *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 192 (2004).

Here, as noted in detail throughout this opinion, there is no evidence whatsoever that any interference or communication with third-party prospective employers ever happened, or if it did, that it was "wrongful." Rather, in response to Clifford Chance's motion, Memnon relies entirely on the allegations of her complaint. However, it is beyond peradventure that to survive summary judgment, a party must show that there is sufficient *evidence* for a reasonable jury to find in her favor; at this stage, mere reference to *allegations* is simply not enough. *See, e.g.*, *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 138 (2d Cir. 2009); *Vaughn v. Consumer Home Mortgage Co., Inc.*, 297 Fed. Appx. 23, 27 (2d Cir. 2008) (quoting *Contemporary Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 (2d Cir. 1981)). Thus, for all the reasons discussed above with respect to Memnon's retaliation claims, her tortious interference with business relations claim likewise must fail.

16

## C.    MEMNON'S CLAIMS AGAINST S&W

### *1. Retaliation*

Turning to Memnon's retaliation claim against S&W, here again the Court is faced with the familiar situation of a claim based on allegations of communications between Clifford Chance and S&W of which there is simply no evidence.  That is, as mentioned multiple times, Memnon has come forward with no evidence that Clifford Chance ever had any communications with S&W, or if it did, what those communications might have entailed.  Indeed, Memnon has essentially conceded her inability to provide this evidence.  *See* 5/4/09 Dep. Tr. at 219:6-19, 220:16-221:7.  Without any such evidence, Plaintiff cannot establish that S&W was aware of any protected activity that she undertook while employed at Clifford Chance, and therefore her *prima facie* claim must fail.  *See Jute*, 420 F.3d at 173 (finding that defendant's awareness of protected activity is a required element of *prima facie* claim of retaliation); *see also Gordon v. Marquis*, No. 3:03CV01244 (AWT), 2007 U.S. Dist. LEXIS 27811, at *35 (D. Conn. Mar. 31, 2007) ("[A] causal connection cannot exist if the person allegedly responsible for the adverse action had no knowledge of the protected activity.") (citing cases).

In an attempt to raise a genuine issue of material fact, Plaintiff points to two possible ways in which S&W may have gained awareness of her previous protected activities.  First, Memnon notes that Truman Bidwell, a partner at S&W, testified at his deposition that he had an ongoing professional relationship with a corporate department partner at Clifford Chance.  *See* Deposition of Truman Bidwell Transcript ("Bidwell Dep. Tr.") at 51:21-53:2.  Thus, goes Memnon's argument, when Bidwell and the Clifford Chance partner sat together to work on a deal, Bidwell must have mentioned that S&W had recently hired a former Clifford Chance associate.  *See* 9/29/09 Tr. at 47:3-13 ("It is not likely that those two guys, when they sat in a room doing the deal, that Bidwell didn't mention to the Clifford Chance partner that we hired this new associate from your firm.  It's unlikely that did not happen.").  However, in the very next lines of his deposition transcript, Bidwell testified unequivocally that he never communicated with anyone at Clifford Chance about Memnon, *id.* at 53:3-7, and she has come forward with nothing but rank speculation to indicate to the contrary.  Second, Memnon points to the fact that after she had begun to work at S&W, she had requested that Clifford Chance's counsel send a copy of the Settlement Agreement to her at her work address.  *See* Memnon Decl. ¶ 30.  However, Memnon admits that the envelope containing the Settlement Agreement was sealed when she received it, and she has not come forward with any evidence that anyone at S&W knew about her protected

activity at Clifford Chance. That being the case, Memnon has failed to establish her *prima facie* claim for retaliation against S&W, and summary judgment as to that claim is granted.

## 2. *Employment Discrimination*[15]

As above, Memnon's claim against S&W for discriminatory termination is analyzed under the *McDonnell Douglas* framework. Here, there is no dispute as to two elements of her *prima facie* claim: she is an African-American woman of Haitian descent, and the termination of her employment at S&W undoubtedly constitutes an adverse employment her action under any of the applicable statutes. S&W argues, however, that Memnon fails to establish her *prima facie* claim because she cannot show that she satisfactorily performed her duties, and because she cannot show that the circumstances of her termination give rise to an inference of discrimination. I disagree.

S&W has submitted voluminous evidence that supports its position that Memnon was incapable of performing rudimentary tasks and did not understand basic concepts with which an associate of her level would have been expected to have been fluent. However, Memnon has come forward with sufficient evidence to create genuine issues of material fact on this score. First, Memnon notes that the record in this case is devoid of any contemporaneous writings – be they internal memoranda, emails or diary entries – that show any indication that anyone was dissatisfied with her performance. *See* Bidwell Dep. Tr. at 30:20-32:25; Deposition of Jon Jenkins ("Jenkins Dep. Tr.") at 58:21-59:21; Deposition of Martha Coultrap ("Coultrap Dep. Tr.") at 10:2-10. Of course, this may well have been because there had been no formal reviews or evaluations in the few weeks that Memnon was employed at S&C, but that is not an issue to be resolved on summary judgment. Second, Memnon attests that she was never informed that any partner with whom she worked was ever dissatisfied with her performance, and she consistently sought out informal feedback from the attorneys with whom she had worked and had consistently been told that her work was satisfactory.[16] *See* Memnon Decl. ¶ 31b-37. Moreover, Plaintiff avers that after

---

[15] Throughout this litigation, Memnon has premised her "wrongful termination" claim on allegations of "collusion" between S&W and Clifford Chance. As should be clear by now, Plaintiff has pointed to no evidence of any such collusion anywhere in the record. Accordingly, to the extent her employment discrimination claim is based on these allegations, it must be dismissed. However, more recently, Memnon has argued that her discrimination claim is based on alleged disparate treatment; *i.e.*, she argues she was terminated from S&W because of her race and/or national origin. The Court will therefore proceed to consider the merits of this basis for her employment discrimination claim.

[16] S&W objects to Memnon's attempt to raise issues of fact through her "own self-serving affidavit." However, precedent in this Circuit makes clear that certain uncorroborated affidavits by the non-moving party, standing alone, may be sufficient to create a genuine issue of material fact sufficient to survive summary judgment in a discrimination case. *See, e.g.*, *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998); *see also Jenkins v. Area Cooperative Educ. Servs.*, 248 F. Supp. 2d 117, 126-27 (D. Conn. 2003); *Upper Hudson Planned Parenthood, Inc. v. Doe*, 90-CV-1084, 1999 U.S. Dist. LEXIS 6263, at *14 (N.D.N.Y. Apr. 28, 1999).

she was terminated, she was able to take with her one of the clients for whom she had worked, *see* Memnon Decl. ¶ 36, which is highly unlikely to have occurred if she was as incompetent as S&W now claims. Accordingly, Memnon has sufficiently raised a genuine issue of material fact as to whether she performed her job satisfactorily.

S&W also contends that Memnon is unable to satisfy the fourth element of her *prima facie* case, relying principally on the "same-actor inference." That is, S&W contends that because the same people made the decision to hire Memnon as made the decision to terminate her, there cannot possibly be an inference of discrimination. To be sure, the Second Circuit has found "that if the person who fires an employee is the same person that hired him, one cannot logically impute to that person an invidious intent to discriminate against the employee." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 132 (2d Cir. 2000). Here, the record shows that the decision to hire Memnon was made jointly by Jenkins, Lindsay, Bidwell and Coultrap. However, there is evidence to suggest that several weeks later, the decision to terminate Memnon was made by Jenkins in consultation with Lindsay, Bidwell and Coultrap, as well as Goss and Barnard. Thus, there is a question of fact as to whether it was in fact the very same people who made the decision to hire and fire Memnon. *See Fanning v. Gold Sys., Inc.*, 05CV1202 (JCH), 2007 U.S. Dist. LEXIS 175941, at * 12-13 (D. Conn. Mar. 14, 2007); *Sciola v. Quattor Piu, Inc.*, 361 F. Supp. 2d 61, 65-66 (E.D.N.Y. 2005). Moreover, as several courts have found, the same-actor inference is permissive, not mandatory, and even if the same individuals made both decisions, the Court would not be compelled to give S&W the benefit of the inference at this stage of the litigation, and I don't. *See, e.g., Braunstein v. Barber*, 06 Civ. 5978 (CS) (GAY), 2009 U.S. Dist. LEXIS 323536, at *24-25 (S.D.N.Y. Mar. 27, 2009) (citing *Copeland v. Rosen*, 38 F. Supp. 2d 298, 305 (S.D.N.Y. 1999)).

Furthermore, Memnon has presented facts that raise genuine questions of material fact as to whether the decision to fire her was the result of discriminatory animus. Specifically, there is evidence that the very next senior associate to be hired in S&W's corporate department in New York was white, and that in 2007 and 2008, S&W hired six associates in the corporate department of which only two were black (one of whom was Memnon), and both of those black associates were either terminated or experienced performance problems, whereas all four of the white associates are still employed by S&W and have had no problems with performance. *See* Jenkins Dep. Tr. at 96:5-107:23. Under these circumstances, Memnon has met her "minimum" burden of establishing a *prima facie* claim of disparate treatment.

Memnon having satisfied her burden on the first prong of the *McDonnell Douglas* analysis, the burden of going forward shifts to S&W to articulate a legitimate nondiscriminatory purpose for its decision to terminate her. S&W indisputably has shouldered this minor burden by showing that Memnon was fired because her performance was below expectations and unsatisfactory to her supervisors. Accordingly, the burden of proof now shifts back to Memnon to show that this proffered reason is merely a pretext for discriminatory animus based on her race or national origin. A plaintiff alleging employment discrimination may show pretext where "the employer's given legitimate reason is unworthy of credence," *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1113 (2d Cir. 1988), "by reliance on the evidence comprising the prima facie case, without more," *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 28 (2d Cir. 1994), or "by demonstrating that similarly situated employees outside the protected class were treated differently." *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 249 (S.D.N.Y. 2001). Here, the same facts that give rise to genuine issues of material fact as to Memnon's *prima facie* claim also give rise to questions as to whether the proffered reason for her termination was really a pretext for discrimination based on her race or national origin. Accordingly, questions of fact abound on Memnon's employment discrimination claim against S&W, and summary judgment on that claim must be denied.

## IV. CONCLUSION

For the foregoing reasons, Defendant Clifford Chance's motion for summary judgment is granted with respect to Memnon's claims for employment discrimination, retaliation and tortious interference with business relations and is denied with respect to the breach of contract claim. Defendant S&W's motion for summary judgment is granted with respect to Memnon's retaliation claim and is denied with respect to the employment discrimination/wrongful termination claim. The breach of contract and employment discrimination claims will proceed to trial beginning December 14, 2009. A trial notification setting forth the deadlines for submission of pretrial materials will be transmitted to the parties contemporaneously with this opinion. The Clerk of this Court is instructed to close these motions.

**IT IS SO ORDERED.**
**New York, New York**
**October 2ᵟ, 2009**

_____
U.S.D.J.

20

# ATTACHMENT B

CIVIL COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X       Index No: 044300
CAROLINE MEMNON,

Plaintiff

-against-                                    VERIFIED AMENDED ANSWER
                                             AND COUNTERCLAIM
WINE PROJECT, INC.

Defendants.

-------------------------------------------------------------------X

The defendant Wine Project Inc. as and for its amended verified answer to the amended
complaint respectfully states:

## IN ANSWER TO THE FIRST CAUSE OF ACTION

1. Denies knowledge of information sufficient to form a belief as to the allegations
contained in paragraph "1" of the complaint.

2. Denies each and every allegation contained in paragraph "3" and "7" of the complaint.

3. Denies so much the allegations of paragraph "4" of the complaint that implies that the
legal services performed by the plaintiff were properly prepared or that the same were necessary.

4. Defendant admits the receipt of a document that payments to be a bill for services
rendered and defendant refers to said document for its contents and legal interpretation.

5. The defendant admits the payment of funds alleged in paragraph 6 of the complaint to
the plaintiff but said payments were made as a result of plaintiff's threats and coercion and not
because the money was owed, and defendant otherwise denies the balance of the allegations
contained in paragraph 6 of the complaint.

## IN ANSWER TO THE SECOND CAUSE OF ACTION

6. With respect to the allegations contained in paragraph "8" of the complaint, defendant
refers to Court to paragraphs "5" and "6" of the answer and incorporates said paragraphs herein:

7. Denies each and every allegation contained in paragraphs "9" and "10" in the
complaint.

## IN ANSWER TO THE THIRD CAUSE OF ACTION

8. Defendant denies each and every allegation entered in paragraph "12" "14" and 14 of the complaint.

9. The defendant denies the allegation entered in paragraph 13 of the complaint except admits partial payment was improperly extracted from defendant by plaintiff.

## DEFENSE TO ALL CAUSES OF ACTION

## AS AND FOR A COMPLETE FIRST

10. The Court lacks personal jurisdiction over the Defendants.

## AS AND FOR A SECOND COMPLETE

## DEFENSE TO ALL CAUSES OF ACTION

11. Plaintiff fails to state a cause of action.

## AS AND FOR A THIRD COMPLETE DEFENSE TO ALL

## CAUSES OF ACTION

12. The Plaintiff performed the legal services in a negligent and sub standard manner and has caused the Defendant damages in excess of the amount claimed to be due and owing to Plaintiff. In addition the Plaintiff deliberately and improperly overcharged and churned the bill for the alleged services.

## AS AND FOR A FOURTH COMPLETE DEFENSE TO

## ALL CAUSES OF ACTION

13. The plaintiff failed and refused to have a written return agreement with defendant nor did plaintiff supply defendant with an engagement letter thereby barring recovery of legal fees.

## AS AND FOR A COUNTERCLAIM

14. The Defendant is a corporation licensed to do business in the State of New York and has offices in the City, County and State of New York.

15. The Defendant as all terms hereinafter mentioned is in the business of buying, selling, and distributing among other things, wines

16. That the Plaintiff, who upon information and belief is an attorney at law, held herself and to be an expert who specializes in obtaining liquor licenses for clients from the appropriate New York State Authority.

17. Based upon plaintiff's claim of expertise, the plaintiff took steps to obtain a "Wholesale License" to enable defendant to distribute wine and other products.

18. The plaintiff improperly and negligently provided services that were below the standard of care established by other attorneys in the community, and the acts of the plaintiff in the rendition of said legal services constitute legal malpractice by the plaintiff causing the defendant damages.

19. There but for the improper and negligent conduct of the plaintiff the defendant would not have suffered damages.

20. As a result of the plaintiff's malpractice, the defendant has suffered damages in the sum of not less than $50,000, the exact amount to be established at trial.

## AS AND FOR A SECOND COUNTERCLAIM

21. That the plaintiff deliberately and without any basis in fact in law, churned and over billed the defendant for services rendered by more than $25,000 and by threats and coersion received $15,000 from the defendant without performing the task undertaken.

22. Upon information and belief the normal customary and usual charge for the services rendered (had the assignment been completed by plaintiff) by other attorneys in the community would not be in excess of $7500.

23. The plaintiff is obligated to refund $7500 if not all of the money received to defendant.

Wherefore defendant demands judgment dismissing the plaintiff's complaint and judgment in its First Counterclaim in the sum not less than $50,000, and the second counterclaim not less than $7500 together with appropriate interest and the costs and disbursements of the actions.

Yours truly,

GAIL H. TELLEYSH
Attorney for Defendant
300 East 42nd Street
New York, N.Y. 10017

## VERIFICATION

STATE OF NEW YORK )
                        ) ss:
COUNTY OF NEW YORK )

      Pietro Cavallo, Vice President of Wine Project, Inc. being duly sworn, deposes and says that he is the party defendant referred to in the foregoing answer, that he has read the foregoing answer and know the contents thereof; that the same is true to my knowledge, except as to the matter therein stated to be alleged on information and belief and as to those matters be believes such matters to be true.

WINE PROJECT, INC.

By: _____
       Pietro Cavallo

Sworn to before me this
13ᵗʰ Day of May, 2009

_____
Notary Public

CARMEN FIGUEROA
Notary Public, State of New York
No. 01FI6083524
Qualified in Bronx County
Commission Expires February 22, 2011

CIVIL COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
----------------------------------------------------X
CAROLINE MEMNON,

        Plaintiff(s),                AFFIRMATION IN SUPPORT

       -against-

                              **Index No.** 044300/2008

WINE PROJECT INC.,

        Defendants.
----------------------------------------------------X

David A. Zelman., an attorney duly admitted to practice before the Courts of the State of
New York, affirms the following, under penalty of perjury:

1. That I am a member of the firm Law Office of David Zelman, attorney for the plaintiff
CAROLINE MEMNON herein and I am a fully familiar with the facts and circumstances
as revealed by the file maintained in this office. Plaintiff submits this affirmation in
support of Plaintiff's Motion for Summary Judgment. Plaintiff's causes of action against
the defendant consists of breach of contract, account stated, and quantum meruit claims.
For the following reasons, the moving plaintiff is entitled to summary judgment,
assessing full liability to WINE PROJECT, INC.

**FACTS**

2. Plaintiff, an attorney licensed in the State of New York, is suing her former client WINE
PROJECT, INC. for unpaid legal fees in the amount of $24,897. A copy of Plaintiff's

1

Invoice is annexed hereto as Exhibit "A". For a detailed description of the facts underlying this action, plaintiff respectfully refers the court to Plaintiff's Affidavit, annexed hereto as Exhibit "B". What follows, for the convenience of the Court, is a brief synopsis of the factual background of the case at hand.

3. Plaintiff was hired by defendant, via defendant's attorney, Emmanuel Alemagna, Esq., in April of 2007 to obtain certain federal and state licenses for the sale of alcohol. As per the retainer agreement, plaintiff was to receive $200 per hour. Although plaintiff has since misplaced the original retainer, which was executed by Mr. Alemagna, annexed hereto as Exhibit "C" please find a copy of the original agreement.

4. Plaintiff estimated that the cost of the application process at $2,000 because defendant had already initiated the application process. (Ex. B, ¶¶ 2-3).

5. Initially, plaintiff was hired to obtain federal and New Jersey import licenses for defendant. During the course of the representation, defendant determined that it would, before seeking a New Jersey import license, it would require a New York import license.

6. Plaintiff performed legal services on behalf of defendant and, due to her diligent efforts, secured both a federal and a New York import license. (See Ex. C, p. 1-2). The applications were timely submitted but were not granted until months later due to the investigation process of the governmental bodies. (See, annexed hereto as Exhibit "D", Email 2/14/08). On January 7, 2008, plaintiff submitted an invoice for her services. (Ex. A).

7. On February 7, 2008, plaintiff contacted defendant to request full payment of the invoice, having only received partial payments totaling $5,000. (See, annexed hereto as Exhibit

"E", Email 2/7/2008). In response, on February 15, 2008, defendant promised to make payment in full. (See, annexed hereto as Exhibit "F", Email 2/15/2008).

8. On or about March 4, 2008, plaintiff received an additional $10,000. (See, annexed hereto as Exhibit "G", Pl.'s Bank Statement).

9. Plaintiff continued to work for defendant until approximately May 2, 2008, when Mr. Alemagna, on behalf of WINE PROJECT, INC., wrote a letter of termination. (A copy of this letter is annexed hereto as Exhibit "H"). In the letter, Mr. Alemagna acknowledged that WINE PROJECT, INC. retained plaintiff and had made a payment to her for services rendered in the amount of $15,000. However, Mr. Alemagna claimed that Defendant was not responsible for payment of the balance because it had allegedly suffered damages from the delay in the approval of its licenses and that the requested fee was excessive.

10. From January 7, 2008, the date plaintiff sent out the invoice, until on or about May 2, 2008, plaintiff made repeated demands for payment which were not honored. At no during plaintiff's representation of defendant did defendant complain of the quality of plaintiff's work. To date, defendant has yet to pay the balance of $24,897 for the legal services performed.

**LEGAL HISTORY**

11. Prior to commencing this litigation, on or about May 23, 2008, plaintiff offered to mediate and/or arbitrate this matter pursuant to Part 137 of the Rules of the Chief Administrator of the Courts. (A copy of offer is annexed hereto as Exhibit "I"). Although defendant received this notice, defendant either refused or neglected to consent to arbitration in a timely manner.

12. On July 11, 2008, plaintiff filed her complaint and brought causes of action for breach of contract and account stated.

13. On December 26, 2008, defendant moved pursuant to CPLR 3212 for summary judgment. Plaintiff filed her opposition on January 9, 2009, and, three days later, filed a motion to amend the complaint to add a cause of action for quantum meruit.

14. On April 20, 2009, the Honorable Tanya R. Kennedy denied defendant's motion for summary judgment and granted plaintiff's motion to amend the complaint. A copy of this Decision is annexed hereto as Exhibit "J".

15. Plaintiff filed the Amended Complaint on May 12, 2009. (Annexed hereto as Exhibit "K"). Defendant submitted its Verified Amended Answer and Counterclaims on or about May 13, 2009. (Annexed hereto as Exhibit "L"). On May 22, 2009, plaintiff filed the Answer to Counterclaims. (Annexed hereto as Exhibit "M").

**I. Breach of Contract**

16. As per the retainer agreement, plaintiff diligently performed legal services and obtained both a New York and a federal import license, defendant has failed to abide by its contractual duty to compensate Plaintiff at the agreed upon rate.

17. In the case of an attorney-client contractual relationship via a retainer, as with all contract disputes, "[t]o establish a right to recover for breach of contract, a party must prove (1) the existence of a contract; (2) performance of the contract by the injured party; (3) breach by the other party; and (4) damages." Tal v. Leber, 2008 NY Slip Op 51890U, at *9 (N.Y. Sup. Ct., New York County Sept. 9, 2008) (citations omitted).

18. A retainer agreement is valid if "the fee contract is fair, reasonable, and fully known and

4

understood by the client." <u>Koral v. Koral</u>, 185 A.D.2d 298, 299-300 (2d Dept. 1992).

19. As the Honorable Tanya R. Kennedy ruled, 22 NYCRR 1215.1 does not require an attorney to provide a retainer or letter of engagement when the anticipated fee is less than $3,000. (See Ex. I, p. 2).

20. The retainer agreement contains plaintiff's hourly rate of $200, an estimate of a $2,000 total fee for obtaining a federal and New Jersey license, and a disclaimer that the agreed upon work of obtaining licenses might be unsuccessful or more expensive than anticipated. (See Ex. B, ¶ 3; Ex. C). The clients subsequently requested that plaintiff obtain a New York import license. (Ex. B, ¶¶ 3-5).

21. From April of 2007 until May of 2008, plaintiff worked pursuant to the agreed upon terms of the retainer. She submitted bills for her services and received partial payment. At no point during this time did defendant dispute that plaintiff was, in fact, retained to obtain liquor licenses for WINE PROJECT, INC, nor were any complaints made by defendant regarding the quality of plaintiff's work.

22. In the letter dated May 2, 2008, written by Mr. Alemagna on behalf of defendant, Mr. Alemagna acknowledged that plaintiff had been retained by defendant, that defendant had remitted partial payment, and that defendant had become dissatisfied with plaintiff's performance.

23. The retainer agreement was fair and reasonable and defendant breached it by failing to make payments to plaintiff for the legal services rendered.

24. Defendant was clearly aware of the retainer, did not object to its clear terms, allowed plaintiff to operate according to its demands, and sought to escape its performance

5

demands after defendant had reaped the benefits of plaintiff's work.

25. As a result, the breach of contract claim has been established and plaintiff is entitled to the balance of the unpaid legal fees. See, Tal, 2008 NY Slip Op 51890U, at *9. See also, Farrauto v. Keowongwan, 166 Misc. 2d 804, 807 (Civ. Ct., Yonkers 1995).

## II. Account Stated

26. The proof adduced in this litigation establishes an account stated cause of action because defendant received an invoice for legal services provided by the plaintiff, remained silent or otherwise did not object as to the amount owed, and made a partial payment on the account with a future promise of payment in full.

27. An "account stated" has long been defined as "an account balanced and rendered, with an assent to the balance express or implied; so that the demand is essentially the same as if a promissory note had been given for the balance." Seth Rubenstein, P.C. v. Hojanidov, 2006 NY Slip Op 51247U, at *4-5 (Sup. Ct., Kings County 2006) (quoting Volkening v De Graaf, 81 N.Y. 268, 270 (1880)).

28. Receiving an invoice and maintaining possession of it without objection can give rise to an account stated over time. Legum v. Ruthen, 211 A.D.2d 701, 703 (2d Dept. 1994). When a client provides partial payment of an invoice in addition to receipt without objection, the client acknowledges the validity of the invoice and an account stated is established. Rubenstein, 2006 NY Slip Op 51247U, at *5.

29. In addition, a client's "self-serving, bald allegations of oral protests [are] insufficient to raise a triable issue of fact as to the existence of an account stated." Darby & Darby, P.C. v. VSI Int'l, Inc., 95 N.Y.2d 308, 315 (Ct. App. 2000). Limited protests are viewed as

when not concurrently made with receipt of invoices and are contradicted by rejecting an offer of arbitration. Berkman Bottger & Rodd, LLP v. Moriarty, 2009 NY Slip Op 311 (1st Dept. Jan. 22, 2009) (citing, e.g., Darby & Darby, 95 N.Y.2d at 315). Similarly, the Berkman court found that vague claims of excessive fees after the fact are unavailing. Id.

30. WINE PROJECT, INC., received the invoice for plaintiff's services and began partial payments. Defendant even promised in writing to pay the full amount. (Ex. F). As a result, the "assent to balance" was both implicitly and expressly consented to.

31. Furthermore, defendant did not object to the invoice until this dispute arose months later. At this time, defendant voiced protests but, also, rejected plaintiff's offer to arbitrate.

32. The facts establish an account stated and, therefore, plaintiff's right to total compensation. See, Id. See, also, Darby & Darby, 95 N.Y.2d at 315; Rubenstein, 2006 NY Slip Op 51247U, at *6; Legum, 211 A.D.2d at 703.

### III. Quantum Meruit

33. Regardless of whether defendant breached the retainer agreement or is liable under the theory of account stated, plaintiff performed legal services to the benefit of defendant without having received full compensation and, therefore, is entitled summary judgment on her quantum meruit cause of action.

34. An attorney is entitled to receive full payment for her services, despite misplacing the written agreement between the parties, under the theory of quantum meruit. See, Barry Mallin & Assoc. P.C. v. Nash Metalware Co., 2008 NY Slip Op 28007, at *4 (N.Y. Civ. Ct. 2008) (citing Seth Rubenstein P.C. v. Ganea, 41 A.D.3d 54 (2nd Dept. 2007)).

35. To make a claim for quantum meruit, the moving party must show that "(1) the

7

performance of the services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Rubenstein, 2006 NY Slip Op 51247U, at *5. In essence, by accepting the services, an implied contract is created and the person providing the services is entitled to recover the reasonable expected value of those services. Id.

36. Plaintiff endeavored to obtain licenses for defendant and did, in fact, obtain a federal and New York license for defendant. (Ex. B, ¶¶ 3-5). Plaintiff's rate had been discussed in advance and there has never been any contention that the rate was unreasonable. Plaintiff's reasonable expectation to be compensated for her legal services was furthered as she received partial payment and a promise from defendant to pay in full.

37. To prevent the unjust enrichment of defendant, plaintiff should be awarded expectation damages for the legal services rendered. See, Rubenstein, 2006 NY Slip Op 51247U, at *6. See also, Kelley Drye & Warren v. Baran, 163 A.D.2d 205 (1st Dept. 1990); In re Rice for Judicial Dissolution of Peerless Sales Corp., 104 A.D.2d 892, 892-93 (2d Dept. 1984).

WHEREFORE, plaintiff respectfully requests that this Court grant Plaintiff's motion for judgment as a matter of law and for such other and further relief as this Court deems just and proper.

Dated:      Brooklyn, New York
             September 14. 2009

**LAW OFFICES OF DAVID A. ZELMAN**

By: **David A. Zelman, Esq.**
ATTORNEY FOR PLAINTIFF
612 Eastern Parkway
Brooklyn, New York 11225
(718) 604-3072

TO:      **Garil H. Telleysh, Esq.**
ATTORNEY FOR DEFENDANT
340 East 42nd Street
New York, NY 10017

**EXHIBIT A**

242 East 112 #3
New York, NY 10029

Invoice submitted to:
Emanuele Alemagna
Via Boschetti, 1,
20121 Milano, Italy

Monday, January 07, 2008

## Re: Invoice for legal services rendered on behalf of Wine Project Inc.

| 07/05/07 | 4hrs. | $200/hr. | $800 |

E-mail correspondence between Mr. Cavallo, Mr. Alemagna and Ms. Federzoni concerning New York license. Researched and discussed with officials of the New York Liquor Authority about application requirements to obtain a license to distribute wine in New York.

| 07/06/07 | 8 hrs. | $200/hr. | $1600 |

Looked for Wine Project Inc. office space in New York in accordance with the requirement of the New York Liquor Authority. Found space, called owner, and went to visit office space in Brooklyn.

| 07/06/07 | 2 hrs. | $200/hr. | $400 |

Received call from Mr. Alemagna to discuss label registration. Called New York Liquor Authority. Researched sale of stock and licensing issue. Discussed sale of stock to Majestic and licensing in New York.

| 07/11/07 | .5 hr. | $200/hr. | $100 |

E-mail correspondence with Ms. Federzoni concerning majority foreign ownership of wine Project Inc. Called New York Liquor Authority to verify licensing issue.

| 07/13/07 | 7 hrs. | $200/hr. | $1400 |

Researched and discussed with officials of New Jersey Division of Alcoholic Beverage Control about application requirements to obtain a license to distribute wine in New York and New Jersey. Visited lease space with Mr. Cavallo and discussed lease terms.

| 07/15/07 | 7 hrs. | $200/hr. | $1400 |

07/15/07          5hrs.                    $200/hr.          $1000
Commenced work on New York and New Jersey applications. Requested personal data information from Ms. Federzoni to fill out personnel questionnaires. Prepared New York and New Jersey application documents for signature by Mr. Cavallo.

07/16/07          3.5hrs                   $200/hr.          $700
Went to different police stations with Mr. Cavallo to get fingerprints . Discussed majestic situation and requirements for the New York application. Had Mr. Cavallo sign necessary documents for New Jersey and New York applications.

08/09/07          3hrs.                    $200/hr.          $600
Discussed lease terms with Mr. Clairvil and commenced drafting of lease agreement.

08/10/07          3hrs.                    $200/hr.          $600
Searched for bond company that would provide penal bond for Wine Project Inc. in New York and prepared necessary documents.

08/12/07          6hrs.                    $200/hr.          $1200
Focused work on New York application documents including basic application form and lease agreement, and Ms. Federzoni's personnel questionnaire.

08/13/07          7 hrs.                   $200/hr.          $1400
Continued work on New York application and personnel questionnaires (Mr. Cavallo, Ms. Federzoni and Mr. Colombini) and addendums. Liaised with New York Liquor Authority for clarification on certain application questions.

08/15/07          7hrs.                    $200/hr.          $1400
Continued work on New York application and sent e-mail update. Finalized lease terms with Mr. Clairvil and completed lease agreement.

08/17/07          5hrs.                    $200/hr.          $1000
Looked for new penal bond company after concerns by Ameribond regarding majority foreign ownership of Wine Project Inc. Completed application for authority to do business in New York. Sent fax to Mr. Cavallo for signature. Continued work on New York application and completed landlord questionnaire.

08/19/07          5hrs.                    $200/hr           $1000
Completed New York personnel questionnaires and basic application, worked on ancillary documents i.e. letter to municipality, expense sheet, applicant's statement.

08/20/07          3 hrs.                   $200/hr.          $600

08/22/07        3 hrs.        $200/hr.        $600

Liaised with New York Liquor Authority and U.S. embassy in Italy to resolve fingerprint requirement issue for foreign shareholder and director. Updated Ms. Federzoni and Mr. Cavallo by phone call. Reviewed security agreement and discussed Majestic issue with Ms. Federzoni.

09/17/07        4 hrs.        $200/hr.        $800

Called Mr. Cavallo about the authority to do business application in NY continued to work on New York application. Liaised with New York Liquor Authority about information requested. Followed-up with New York Secretary of State concerning authority to do business. Faxed necessary document.

09/18/07        2hrs.        $200/hr.        $400

Met with Mr. Cavallo to sign excise bond document and fingerprint card. Discussed strategizing Wine Project Inc.'s plan of action in light of Majestic issue. Worked on label registration.

09/20/07        5hrs.        $200/hr.        $1000

Continued work on New York application, completing unanswered questions, liaised with the New York Liquor Authority concerning application, drafted ancillary documents, expense sheet, revised lease space diagram and pictures, and drafted letter to Brooklyn municipality informing them of the presence of Wine Project Inc.

09/21/07        5hrs.        $200/hr.        $1000

Made final revision- to New York application.

09/28/07        4hrs.        $200/hr.        $800

Prepared documents and hand-delivered application to New York Liquor Authority. Discussed possibility of expediting process with representative. Fedexed notice letter to Brooklyn municipality about the presence of a wine distribution company in their jurisdiction.

10/1/07        4hrs.        $200/hr.        $800

Liaised with New York Liquor to expedite Wine Project Inc.'s application. Drafted a letter and faxed it to Mr. Ed Reyer to request expediting Wine Project Inc.'s application. Discussed expediting process with Mr. Cavallo and updated Mr. Alerngna.

10/02/07        4hrs.        $200/hr.        $800

Received call from Mr. Alemagna and M. Federzoni provided update. Photocopied Wine Project file for Mr. Cavallo and Ms. Federzoni. Completed and filed label registration.

10/04/07               2hrs.                 $200/hr.           $400
Went to New York Liquor Authority to speak to Mr. Reyer about expedited process. Spoke to his assistant about the need to expedite application.

10/06/07               .5hr.                 $200/hr.           $100
Received call from Mr. Reyer, discussed expediting process and told to contact Investigator Garcia. Liaised with Inv. Garcia about Wince Project. Inc. application.

10/10/07               6hrs.                 $200/hr.           $1200
Continued work on New Jersey application, Called New Jersey Secretary of state to verify authority to do business, sought excise bond company in New Jersey, sent e-mail updates to Ms. Federzoni, Mr. Cavallo, Mr. Alemagna. Made several calls to the New York Liquor Authority concerning expedited process.

10/16/07               5hrs.       .         $200/hr.           $1000
Continued work on New Jersey application. Liaised with the New Jersey Tax and Trade Bureau for clarification on requirements. Made several call to New York Liquor Authority concerning expedited process. Called TTB regarding label registration.

10/18/07               5hrs.                 $200/hr.           $1000
Received call from Mr. Cavallo about New York application fee. Called New York Liquor Authority to inquire about receipt of application fee. Went to New York Liquor Authority to give new fee and to inquire about expedited process Called New Jersey Liquor Authority to ask questions about application. Checked on status of label registration.

10/23/07               4hrs.                 $200/hr.           $800
Re-registered labels for approval, sent new label registration to Federal Tax and Trade Bureau. Spoke to Investigator Garcia about additional documents needed to supplement the New York license application including clarification as to the source of investment from Mr Cavallo, detailed expense forms , method of operation letter, information about Mr. Cavallo's spouse Mrs. Mancini, and wholesale license based on the New York address. Called Mr. Cavallo to update and discuss requirements. Commenced work on supplemental documents.

10/26/07               5hrs.                 $200/hr.           $1000
Commenced work on federal wholesale license based on the New York address. Basic application, personnel questionnaires and addendums, commitment letter/method of operation. power of attorney, and other supporting documents.

10/27/07               5hrs.                 $200/hr            $1000

and drafted letter explaining source of funds. Called TTB to inquire about the wholesale application.

| 11/27/07 | 7 hrs. | $200/hr. | $1400 |

Went to Wine Project Inc. New York office to get TTB permit. Drafted operating methods letter, met with Pietro to sign it. Continued work on New York supplemental documents and New Jersey application.

| 11/28/07 | 6hrs. | $200/hr. | $1200 |

Completed work on New York supplemental documents and New Jersey application. Liaised with New Jersey Division of Alcohol and Beverage control for final questions on application. Prepared documents and hand-delivered New York application supplemental documents to Investigator Garcia.

| 12/11/07 | 6hrs. | $200/hr. | $1200 |

Received call from Investigator Garcia from the New York Liquor Authority about further documents needed to the application including revised TTB permit reflecting a clear delineation of the office space and clarification of Mr. Cavallo's work experience. Drafted faxed and mailed letter to Vicki Mckoy requesting the specified revision to the TTB permit, Spoke to Mr. Cavallo regarding work experience, drafted and sent letter to Investigator Garcia with additional information on Pietro's sales experience. Received call from Ms. Federzoni.

| 12/19/07 | 1hr. | $200/hr. | $200 |

E-mailed update to Ms. Federzoni concerning New York and New Jersey license, updated Mr. Cavallo by phone, Called Vicki McCoy and other representatives at TTB to inquire about revised TTB permit.

| 01/02/08 | 1.25hrs. | $200/hr. | $250 |

Received TTB permit and hand-delivered it to New York Liquor Authority. Spoke to Mr. Cavallo for update on New Jersey application.

**Total:**                                         $38,000.00

**Additional Charges:**

Fed Ex/mail
Transportation                                     $ 372
Phone calls                                        $ 420
Fees and miscellaneous charges                     $ 500
Fax/copies/printing                                $ 480
                                                   $ 125
                                                   _____

**Total:**                                         **$1897.00**

**Total Amount Due:**                              **$39,897.00**

**EXHIBIT B**

Caroline Memnon, Plaintiff in this matter, under oath, deposes and says the following:

1. I am an attorney duly admitted in the State of New York as of 2004. In April of 2007, I was retained by Mr. Emanuele Alemagna, Esq., an attorney acting on behalf of Wine Project Inc. to perform legal services for Wine Project Inc. The retainer which we signed is annexed to the Defendant's moving papers as Exhibit "D".

2. In the process of transitioning into my own practice, I have unfortunately misplaced the original signed retainer. However, attached to my attorney's opposition papers is a letter sent to me by Mr. Alemagna dated May 2, 2008, acknowledging that I was retained to provide legal services to Wine Project Inc. I currently maintain an office at 26 Court Street, Suite 1503, Brooklyn, NY 11242 and a home office at 242 East 112th #3, New York, New York 10029. (The home office I used primarily at the time I serviced Wine Project Inc.)

3. According to the terms of the retainer, I was to be paid at a rate of $200/hr. I initially estimated the cost to complete the federal import license and New Jersey wholesale license to be approximately $2000, because the initial application process had already been started for Wine Project Inc. However, I stated in the retainer as follows:

"This estimate is imprecise as my knowledge of the facts at this time is limited. I will advise you if fees will be significantly higher than this estimate. At such time, you may decide to restrict the scope of my efforts or we may make other adjustments. This estimate does not include cost items."

In accordance with my retainer, I discussed the matter closely with Wine Project Inc. and Mr. Alemagna. They orally agreed that I should proceed with the license applications at the rate of $200/hr, understanding that my fees would be greater than the $2000 estimated in my retainer. They asked me to first concentrate on obtaining the federal license and then later work on the New Jersey license as well as a New York wholesale license. I successfully obtained a federal import license and then immediately concentrated on obtaining now the New York and New Jersey licenses. I did not send a revised retainer with a new estimate as this matter was fully discussed between myself and both Mr. Alemagna and Mr. Pietro.

4.   I sent my first invoice for services rendered on behalf of Wine Project, Inc. in July 2007 to Wine Project, Inc via Mr. Alemagna, the attorney for Wine Project, Inc. The invoice was for a total of $6125. Wine Project paid the invoice, however, they requested and received a discount from that invoice. Wine Project, Inc. paid $5000 on or about August 7, 2007.

5.   I began working on the New Jersey and New York wholesale license in July of 2007. In September of 2007, Wine Project decided to only apply for the New York license. I expedited the application process through the New York Liquor Authority. Through my diligent effort, I succeeded in having Wine Project Inc.'s license issued in less than 5 months.

6.   I continued on with the New Jersey license and sent Wine Project Inc. an invoice in January of 2008 which is annexed to the defendant's moving papers as Exhibit "D". Mr. Alegmagna on behalf of Wine Project Inc. agreed to pay the invoice as

well as other principals of Wine Project, Inc. After a month of assurances by Wine Project Inc. no payment was forthcoming.

7.  My January invoice for legal services rendered is in the amount of $39,897.00. I came up with a payment plan dated February 25th, to which Wine Project agreed. Wine Project made the first payment of the payment plan accordingly, but reneged on all subsequent payments. To date after several demands for payment, I have received a total $15,000 from Wine Project Inc. for legal services rendered as described in the January invoice, leaving a balance of $24, 897.

8.  Wine Project Inc. challenges this suit frivolously, in order to avoid payment of the legal services they retained me to provide. Now that Wine Project Inc. is distributing wine and benefiting from the licenses obtained through my legal services, I request relief in full payment of my balance.

9.  Other than comments made by the defendants herein regarding the length of time necessary to obtain a wholesale wine distribution license, at no time prior to submitting my January 2008 invoice did any person, on behalf of Wine Project, Inc., Mr. Cavallo or Mr. Alegmagna complain of the quality of the legal services offered them.

Caroline Memnon

Sworn to and subscribed before me this day of _1st day of December, 2008_

DAVID A ZELMAN
NOTARY PUBLIC, State of New York
No. 02ZE6148776
Qualified in New York County
Commission Expires 1 20 11

**EXHIBIT C**

Caroline Memnon, Esq.
242 East 112 #3
New York, New York 10029

04/02/07

Emanuele Alemagna, Esq.
Ripa di Meana LC & Associati
Via Boschetti 1
20121 Milano, Italy

RE: **_Employment of Ms. Caroline Memnon, Esq. by Ripa di Meana LC& Associati_**

Dear Mr. Alemagna:

Thank you for selecting me to assist you in providing corporate legal services to Wine Project Inc. This letter will confirm our recent discussion regarding the scope and terms of this engagement.

I will assist you in completing and filing on behalf of Wine Project Inc. a federal wine import license and a New Jersey wine wholesale license and any further legal assistance as communicated by you as the need arises.

You have agreed to pay for my services based on the time I spend working on your matter. My current hourly rate is $200 per hour. Generally, you will be billed for all time spent on your matter.

I will forward billing statements monthly. They will contain a description of services, including the date, the amount of time involved, and a description of the task accomplished. Monthly statements also will itemize monies I have advanced on your behalf, such as service and filing fees, charges for travel, telephone calls, and photocopies.

As discussed, my current estimate for this engagement is $2000. This estimate is imprecise as my knowledge of the facts at this time is limited. I will advise you if fees will be significantly higher than this estimate. At such time, you may decide to restrict the scope of my efforts or we may make other adjustments. This estimate does not include cost items.

You will appreciate that I can make no guarantee as to Wine Project Inc.'s success in obtaining a federal wine import license or a state wine wholesale license.

excellent legal service.

If this letter fairly states our agreement, will you please so indicate by signing and returning the enclosed copy in the enclosed envelope. If you have any questions or concerns, please call me to discuss them. I greatly appreciate the opportunity to assist you in representing Wine Project Inc. and look forward to working with you.

Sincerely,

Caroline Memnon, Esq.

_____
Emanuele Alemagna, Esq.                    Date
Ripa di Meana LC& Associati